CHRISTIE BRINKLEY, Appellant, v JOHN CASABLANCAS et al., Respondents.

First Department, May 14, 1981

APPEARANCES OF COUNSEL

*A. Richard Golub* for appellant.

*Melvin Simensky* of counsel *(David M. Rubin* with him on the brief; *Gertsen, Scherer & Kaplowitz,* attorneys), for John Casablancas and another, respondents.

*Ronald L. Nurnberg* of counsel *(Kane, Kessler, Proujansky, Preiss & Nurnberg, P. C.,* attorneys), for Galaxy Publishing Corp., respondent.

*Norman L. Faber* of counsel *(Hall, Dickler, Lawler, Kent & Howley,* attorneys), for Spencer Gifts Retail Stores, Inc., respondent.

OPINION OF THE COURT

SULLIVAN, J.

Plaintiff, a highly successful fashion model, whose photograph has appeared on the covers of nationally known magazines such as *Harper's Bazaar, Mademoiselle, Ladies Home Journal* and *Sports Illustrated,* has brought this action to enjoin the unauthorized publication, distribution and sale of a poster bearing her photograph in violation of her right of privacy under section 51 of the Civil Rights Law and to recover damages for injuries sustained as a result of this unauthorized, commercial use of her photograph. Named as defendants are her former model agency, Elite Model Management Corp., its president, John Casablancas, the publisher and distributor of the poster, Galaxy Publishing Corp., and two retail stores, Spencer Gifts Retail Stores, Inc., and Oomi Enterprises, Inc.[1]

In September, 1979, Casablancas, in his personal capacity, entered into a licensing agreement with Galaxy for the production and worldwide distribution of a series of posters bearing the photographs of several top models, including plaintiff. Under the agreement Casablancas was obliged to furnish the models' photographs from which Galaxy would produce the posters. Galaxy's right to print, publish and vend the posters was conditioned upon Casablancas obtaining the consent of the models.

Plaintiff agreed to participate in the poster project and, after choosing the hair stylist, makeup artist and bathing suit in which she posed, took part in a photographic session. While she was being photographed, a cable television production company filmed the session for use as part of a television special on the careers of America's foremost models. Eventually, the film of the photographic session was included in a program entitled "Beautiful, Baby, Beautiful", subsequently broadcast throughout the United States on three occasions in March, 1980 by Home Box Office, a national cable television network. Plaintiff appeared in that broadcast in the same pose and bathing suit as in the subject poster. Additionally, a photograph

---

1. Although served, Oomi has not appeared in this action.

of plaintiff, almost identical to the poster photograph, appeared with her consent in a print advertisement for the Home Box Office special.

In the two months following the photographic session plaintiff reviewed color transparencies and discussed the selection of the most suitable print for use in the poster production with Casablancas, members of his staff, and Michael Reinhardt, the photographer. She also reviewed poster proofs which Galaxy had developed from prints delivered by Casablancas. The photograph which eventually appeared on the poster was selected by plaintiff and accepted by Casablancas, Reinhardt and Galaxy. After some final retouching of the photograph, undertaken at plaintiff's request, Galaxy proceeded to print the poster and began commercial distribution in March, 1980. Spencer, a "mass merchandiser", purchased 432 copies of the poster, none of which have been resold, without knowledge of any dispute over its distribution. Oomi purchased 24 posters, of which an unspecified number have been resold. Both purchases were without the knowledge or consent of plaintiff, Casablancas or Elite, although Galaxy contends that some time prior to October 3, 1979, Casablancas had orally confirmed that he had plaintiff's consent to proceed with the project. All parties concede that plaintiff never signed the customary written release authorizing distribution of a model's photograph or likeness.

Upon learning of the unauthorized sale of the poster, Casablancas, after first making an unsuccessful effort to secure plaintiff's written consent, terminated his contract with Galaxy. Less than one month later plaintiff commenced this action, and simultaneously sought a preliminary injunction against any further distribution of the poster.

Alleging an unauthorized commercial exploitation of her name and picture by the production and sale of "pin-up" posters bearing her likeness, with consequent injury to her feelings and wrongful invasion of her right of publicity, plaintiff sought a permanent injunction, as well as compensatory and exemplary damages against all the defendants under section 51 of the Civil Rights Law; an accounting, based on an alleged breach of fiduciary duty,

of all profits received by Casablancas and Elite from the sale and distribution of the poster; and compensatory and exemplary damages against Casablancas, Elite and Galaxy for conspiracy to defraud.

Defendants moved to dismiss the complaint for failure to state a cause of action.[2] In opposing plaintiff requested the court to treat the motions as motions for summary judgment (CPLR 3211, subd [c]), and to grant her partial summary judgment on the issue of liability on her right of privacy claims (CPLR 3212, subd [e]).[3] Holding that section 51 of the Civil Rights Law was never intended to afford a cause of action for invasion of privacy to one who, with the legitimate expectation of sharing in the profits, willingly and knowingly participates in a project which will publicize her name and picture, Special Term granted defendants partial summary judgment and dismissed the right of privacy claims, from which determination this appeal is taken. Inasmuch, however, as only plaintiff has appealed, our concern is solely whether a triable issue of fact exists as to the right of privacy causes of action.

Until the enactment in 1903 of sections 50 and 51 of the Civil Rights Law (L 1903, ch 132, §§ 1, 2), the right of privacy had not "as yet found an abiding place in [New York] jurisprudence." *(Roberson v Rochester Folding Box Co.,* 171 NY 538, 556.) In *Roberson,* the Court of Appeals had found legally insufficient a complaint which sought injunctive relief and damages for injured feelings and mental distress due to the unauthorized distribution of lithographic prints of a young woman's photograph to advertise flour. Noting the absence of any allegation that plaintiff was libeled by the publication for which, of course,

---

2. Defendants Casablancas and Elite moved only to dismiss the first and second causes of action asserting the right of privacy claims.

3. During the pendency of these motions the application for a preliminary injunction was granted as to defendants Galaxy, Spencer and Oomi only. The grant of the preliminary injunction was conditioned upon the posting of an undertaking in the sum of $25,000, a condition which, we are told, was never met. No appeal was taken from this order which determination plaintiff urges as the law of the case, a contention never made at Special Term. In any event, in the absence of an affirmance after appeal this order is not binding on this court. *(Burgundy Basin Inn v Watkins Glen Grand Prix Corp.,* 51 AD2d 140, 143.)

the common law would have provided a remedy, the court suggested that the protection of the right of privacy was a matter for legislative enactment. Prompted by the holding in *Roberson*, the Legislature enacted sections 50 and 51 of the Civil Rights Law at its next session. (See *Rhodes v Sperry & Hutchinson Co.*, 193 NY 223, 227, affd *sub nom. Sperry & Hutchinson Co. v Rhodes*, 220 US 502.) Section 50 provides a penal sanction while section 51 provides a cause of action for both injunctive relief and monetary redress when, without his or her written consent, a person's "name, portrait or picture is used within this state for advertising purposes or for the purposes of trade."[4]

Since its purpose "is remedial and rooted in popular resentment at the refusal of the courts to grant recognition to the newly expounded right of an individual to be immune from commercial exploitation" *(Flores v Mosler Safe Co.*, 7 NY2d 276, 280-281; see *Lahiri v Daily Mirror*, 162 Misc 776, 779), section 51 of the Civil Rights Law has been liberally construed over the ensuing years. Where First Amendment guarantees are involved, however, its application has been restricted "to avoid any conflict with the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest." *(Spahn v Julian Messner, Inc.*, 18 NY2d 324, 328, vacated and remanded 387 US 239, on rearg 21 NY2d 124.) "[F]reedom of speech and the press under the First Amendment transcends the right to privacy." *(Namath v Sports Illustrated*, 80 Misc 2d 531, 535, affd 48 AD2d 487, affd 39 NY2d 897.) Thus, the right of privacy of those who, voluntarily or otherwise, have become public figures and in whose activities a legitimate public interest exists, is significantly curtailed. *(Koussevitzky v Allen, Towne & Heath*, 188 Misc 479, affd 272 App Div

---

4. Insofar as is relevant section 51 of the Civil Right Law provides: "Any person whose name, portrait or picture is used within this state for advertising purposes or for the purpose of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by * * * [the last section], the jury, in its discretion, may award exemplary damages."

759.) "Once a person has sought publicity he cannot at his whim withdraw the events of his life from public scrutiny". *(Goelet v Confidential, Inc.,* 5 AD2d 226, 228.)

A public figure does not, however, surrender all right to privacy. Although his privacy is necessarily limited by the newsworthiness of his activities, he retains the "independent right to have [his] personality, even if newsworthy, free from commercial exploitation at the hands of another". *(Booth v Curtis Pub. Co.,* 15 AD2d 343, 351; see *Gautier v Pro-Football,* 304 NY 354, 359; *Binns v Vitagraph Co. of Amer.,* 210 NY 51.)

In considering the specific issues presented we note at the outset that the sale of the poster was a use of plaintiff's photograph for trade purposes. Defendants do not contend otherwise. Rather, they claim that by performing in the television broadcast "Beautiful, Baby, Beautiful" plaintiff waived her right of privacy to any likeness and image extracted from that public performance. Thus, they argue that the distribution, even for trade purposes, of a poster bearing a photograph taken at a public performance cannot constitute a violation of section 51 of the Civil Rights Law since once the photograph was publicly broadcast with consent it was removed from the sphere of any right of privacy. In support of this argument defendants cite *Ann-Margaret v High Soc. Mag.* (498 F Supp 401). We find the cases factually distinguishable. In *Ann-Margaret,* the plaintiff, a well-known movie star, appeared partially nude in a scene in a motion picture which she knew would be widely distributed. The defendant, publisher of a magazine called *High Society Celebrity Skin,* printed, among other photographs of the plaintiff, a picture of her taken from the movie showing her partially nude. The court held that a subsequent faithful reproduction of a scene from that public performance cannot constitute an invasion of privacy. Moreover, the court found that the willingness of the plaintiff, a widely acclaimed cinema star, to appear in a film partially unclad was a matter of great interest to the public and, as such, constituted a newsworthy event. Neither of these factors is present here. Defendants do not contend, nor could they, that plaintiff's photograph or

the manner in which it was designed to be used involved a subject of general interest so as to bring it within the public domain as a newsworthy matter. And while the offending publication concededly consists of a photograph taken during a public performance, it was not, as in *Ann-Margaret* (498 F Supp 401, *supra*), a part of that performance, or even a segment or frame of the original filmed performance itself. Thus, a different photograph, one never before published, is involved. Noteworthy, also, is that the photograph used to advertise the Home Box Office television special is a different photograph from that used in the poster. We, therefore, reject the argument that the particular photograph appearing on the poster had been previously published.

Moreover, plaintiff never authorized distribution of the particular photograph or poster. While she undoubtedly permitted photographs of herself to be taken which might be used on a poster for commercial sale, she reserved the right, prior to their commercial exploitation, to reject or approve the use to which the photographs would be put. As already noted, a model's photograph is customarily used only after a written release has been obtained. The executed release not only authorized dissemination of the photograph but delineates the extent to which it may be used. Here, plaintiff never gave final approval to the poster nor did she give oral or written consent to its release.

In any event, no claim is made that written consent was given. The law is settled that under sections 50 and 51 of the Civil Rights Law written consent is required before a person's name or photograph may be used for trade or advertising. *(Adrian v Unterman*, 281 App Div 81, 88, affd 306 NY 771; *Roberts v Condé Nast Pubs.*, 286 App Div 729; *Hammond v Crowell Pub. Co.*, 253 App Div 205.) Oral consent is not a defense and is relevant only on the question of damages. "Neither oral consent nor estoppel is a complete defense; they are available only as partial defenses in mitigation of damages." *(Lomax v New Broadcasting Co.*, 18 AD2d 229.)

Moreover, plaintiff's previous written consent to the

use of other photographs of herself does not constitute implied authorization for the use of the photograph involved here. "That [plaintiff] may have voluntarily on occasion surrendered her privacy, for a price or gratuitously, does not forever forfeit for anyone's commercial profit so much of her privacy as she has not relinquished." *(Booth v Curtis Pub. Co.*, 15 AD2d, at p 352, affd 11 NY2d 907.) More recently, this court had occasion to consider specifically the contention that those who thrust themselves into the public arena forfeit their right of privacy, and again rejected the argument. *(Reilly v Rapperswill Corp.*, 50 AD2d 342; see, also, *Youssoupoff v Columbia Broadcasting System*, 48 Misc 2d 700.)

Irrespective of whether distribution of the poster was authorized or justified defendants insist that, although a right of privacy claim is alleged, plaintiff's overriding grievance is not that her feelings have been injured, but, rather, that she has "not been paid one cent for the unauthorized use of [her] photograph while * * * the poster is selling at a phenomenal rate throughout the country." They argue, therefore, that plaintiff's actual plaint is injury to her right of publicity, a cause of action which, proprietary in nature, has not been pleaded and is not within the ambit of section 51 of the Civil Rights Law, which was enacted "to protect the sentiments, thoughts and feelings of [an] individual[s]" *(Flores v Mosler Safe Co.*, 7 NY2d, at p 280). Thus, defendants attempt to draw a distinction between the statutory right of privacy recognized under sections 50 and 51 of the Civil Rights Law and the so-called common-law right of publicity.

New York courts have never explicitly recognized a non-statutory right of publicity (cf. *Wojtowicz v Delacorte Press*, 43 NY2d 858), although the United States Court of Appeals for the Second Circuit, in construing New York law, found that the so-called right of publicity did, in fact, exist independent of the statutory right of privacy *(Haelan Labs. v Topps Chewing Gum*, 202 F2d 866, 868, cert den 346 US 816). In *Factors Etc. v Pro Arts* (579 F2d 215, cert den 440 US 908), the court noted (p 220) that "[t]he distinguishing feature of * * * [the right of publicity] is

that it involves the use of plaintiff's protected right for defendant's direct commercial advantage." The court added (p 220) that "[t]he nature of the remedy also separates the right of publicity" from other species of the right of privacy,[5] in that a plaintiff asserting the right of privacy seeks "to minimize the intrusion or publication of the damaging matter. In contrast, the right of publicity plaintiff does not necessarily object to the commercial exploitation— as long as the exploitation is at his behest and he is receiving the profits." Thus, the two causes of action are distinguished on the basis of the personal character of the right of privacy—the prevention of injury to feelings—and the proprietary nature of the right of publicity. The United States Supreme Court has stated that the State's interest in the protection of the right of publicity "is closely analogous to the goals of [the] patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors and having little to do with protecting feelings or reputation." *(Zacchini v Scripps-Howard Broadcasting Co.*, 433 US 562, 573.)

Since *Haelan* (202 F2d 866, *supra*), other courts, applying New York law, have found the right of publicity to be a valid transferable property right. (See, e.g., *Price v Hal Roach Studios*, 400 F Supp 836, 844; *Groucho Marx Prods. v Playboy Enterprises*, US Dist Ct, SDNY, Dec. 30, 1977, No. 77-1782.)[6] In contrast New York courts have found the statutory right of privacy to be neither descendible (see *Frosch v Grosset & Dunlap*, 75 AD2d 768) nor assignable (see *Rosemont Enterprises v Random House*, 58 Misc 2d 1, affd 32 AD2d 892). (See, also, *Lombardo v Doyle, Dane & Bernbach*, 58 AD2d 620, 621.)

Although the state of the law in the right of privacy area "is still that of a haystack in a hurricane" *(Ettore v*

---

5. As listed by Prosser in his treaties on Torts (Prosser, Law of Torts [4th ed], pp 804-814), the four kinds of interests protected under the umbrella of the right of privacy are intrusion upon the plaintiff's physical solitude, public disclosure of private facts, false light in the public eye, and appropriation of plaintiff's name or likeness for defendant's benefit. The fourth is obviously the so-called right of publicity.

6. For a general discussion of the survivability of the right of publicity, see Sims, Right of Publicity: Survivability Reconsidered, 49 Fordham L Rev 453.

*Philco Tel. Broadcasting Corp.*, 229 F2d 481, 485, cert den 351 US 926), courts applying the law of other States have found the existence of a valuable, transferable property right in one's name, photograph and image. *(Cepeda v Swift & Co.* 415 F2d 1205; *Ettore v Philco Tel. Broadcasting Corp., supra*, pp 487, 489-492, interpreting the law of Pennsylvania, Delaware, New Jersey and New York; but see *Memphis Dev. Foundation v Factors Etc.*, 616 F2d 956, cert den 449 US 953; *Lugosi v Universal Pictures*, 25 Cal 3d 813.)

Other courts have recognized the proprietary nature of an individual's interest in his own identity, separate and distinct from his right not to have his feelings injured. *(Uhlaender v Henricksen*, 316 F Supp 1277; *Sharman v Schmidt & Sons*, 216 F Supp 401, 407; *O'Brien v Pabst Sales Co.*, 124 F2d 167, cert den 315 US 823.)

In *United States Life Ins. Co. v Hamilton* (238 SW2d 289), a Texas case, the plaintiff sued for the unauthorized use of his signature and name in the promotion of defendant's business. Defendant, an insurance company, mailed a letter of solicitation over the signature of plaintiff, as manager, after he had terminated his employment. The court decided that the absence of recognition by Texas of a privacy right was of no moment since the plaintiff had not sued for an invasion of that right and "[t]he use of an individual's signature for business purposes unquestionably constitutes the exercise of a valuable right of property in the broadest sense of that term." *(Supra, p 292.)*

In one of the early cases in this area, where the plaintiff complained that his picture had been used in an advertisement for watches, a Missouri court expressly recognized the valuable property right that an individual has in his own likeness, stating "[i]f there is value in [one's likeness], sufficient to excite the cupidity of another, why is it not the property of him who gives it the value and from whom the value springs?" *(Munden v Harris*, 153 Mo App 652, 659.)

In *Edison v Edison Polyform & Mfg. Co.* (73 NJ Eq 136), one of the earliest cases involving a suit by a public figure, Thomas A. Edison was found to have a property right in his name and likeness which could not be appro-

priated to advertise a patent medicine, even though the formula had been purchased from Edison. In *Pallas v Crowley, Milner & Co.* (322 Mich 411, 415), the owner of a retail department store published in an advertisement the picture, which he had procured, of a showgirl who had allowed herself to be photographed for publicity purposes. Although the plaintiff sued for injury to her feelings, the court, in finding that her privacy had been invaded, cited with approval *Edison* and *Munden (supra)*, for the proposition that a person has a property right in her image. In *Minton v Smith* (276 Ill App 128), which involved a claim of unfair competition, the court, citing *Edison (supra)*, as the "leading case", held that the plaintiff had a property right in her name which could not be appropriated by another in his business. (See, also, *Foster-Milburn Co. v Chinn*, 134 Ky 424; *Flake v Greensboro News Co.*, 212 NC 780; Gordon, Right of Property in Name, Likeness, Personality and History, 55 NWU L Rev 553.)

Despite the absence of explicit recognition of a separate and distinct common-law right of publicity, some New York courts have suggested that such a right might exist. In *Lombardo v Doyle, Dane & Bernbach* (58 AD2d 620, *supra*), the Second Department gave tacit recognition to the distinction between the common-law right of publicity and the statutory right of privacy. In specifically rejecting the Civil Rights Law claim of plaintiff, a well-known band leader, because his name was never mentioned in the television commercial in which his style and type of performance were imitated, the court nevertheless held (p 622) that "there is no question but that a celebrity has a legitimate proprietary interest in his public personality * * * [which] may be entitled to protection". In *Frosch v Grosset & Dunlap* (75 AD2d 768, *supra*), the estate of Marilyn Monroe, alleging violations of the rights of privacy and publicity, sued the author and publisher of a fictional biography of the decedent published after her death. In rejecting the right of privacy claim on the ground that the Civil Rights Law applied only to "any living person",[7] this court, instead of

---

7. Section 50 of the Civil Rights Law, which must be read with section 51, limits the statutory protection to "any living person".

disposing of the right of publicity claim as part of the statutory claim, dismissed it on the separate and distinct ground that even if such a right existed, in view of the public interest in the decedent, the right of free expression would prevail.

Thus, any suggestion in these decisions of the existence of a right of publicity independent of the statutory right of privacy obviously arose because sections 50 and 51 of the Civil Rights Law, due to their limited application, would not accommodate the privacy claim in the particular case. The circumstances were no different in *Haelan Labs. v Topps Chewing Gum* (202 F2d 866, *supra*) where the court was confronted with the issue of whether a contract signed by a ballplayer for the exclusive right to use his photograph in connection with sales of gum created a release of liability, in the absence of which an invasion of the ballplayer's right of privacy would have occurred under sections 50 and 51 of the Civil Rights Law, or an assignment of a property right which defendant's conduct invaded. Similarly, in *Factors Etc. v Pro Arts* (579 F2d 215, *supra*) the issue was whether a grant of the exclusive license to exploit commercially the name and likeness of Elvis Presley, executed two days after Presley's death, survived his death. In *Price v Hal Roach Studios* (400 F Supp 836, *supra*), the court held that the deaths of the actors known as "Laurel and Hardy" did not extinguish the right of publicity held by the grantee of that right.

Irrespective of whether a separate and distinct common-law right of publicity exists in this State, we believe that the so-called right of publicity is subsumed in sections 50 and 51 of the Civil Rights Law to the extent that even a public figure has a privacy interest which finds recognition in the statute and for the violation of which a remedy of monetary redress is provided. We are fortified in that view by the Court of Appeals holding in *Gautier v Pro-Football* (304 NY 354, *supra*). Gautier, a well-known trainer of animals, brought a right of privacy action pursuant to section 51 of the Civil Rights Law, alleging the unauthorized televising for advertising purposes of his half-time performance at a professional football game. Although concluding

that his name or picture had not been used for advertising purposes during the telecast within the contemplation of the statute because plaintiff had not been connected with the commercial announcements by any type of reference, the court nevertheless impliedly recognized a publicity right when it specifically held (p 359) : "While one who is a public figure or is presently newsworthy may be the proper subject of news or informative presentation, the privilege does not extend to commercialization of his personality through a form of treatment distinct from the dissemination of news or information".

The confusion over whether the statutory right of privacy embraces the public figure's commercial interest in the exploitation of his personality is undoubtedly due, in part, to the statute's historical origins and the popular and ready usage of the term "privacy" in referring to the right which it encompasses. (See *Booth v Curtis Pub. Co.*, 15 AD2d 343, 351, n, *supra.*) But the statute does not distinguish between the private person for whom injured feelings may be the paramount concern and the public figure whose right of privacy is limited in any event by public interest considerations, but whose economic interests are affected by the wrongful exploitation of his or her name or likeness. The wrong consists of only two elements: the commercial use of a person's name or photograph and the failure to procure the person's written consent for such use. The damages that flow from the confluence of these two events should be compensable whether the injury is to one's feelings or to his "property" interest. Both injuries are caused by the same wrong and should be redressed by the same cause of action.

When *Gautier* (278 App Div 431, 438, affd 304 NY 354, *supra*), was before this court, we had occasion to note: "The statutory creation in this State of a limited right of privacy was intended for the protection of the personality of an individual against unlawful invasion. [Citations omitted.] It provided primarily a recovery for injury to the person, not to his property or business. The recovery is grounded on the mental strain and distress, on the humiliation, on the disturbance of the peace of mind suffered

by the individual affected. True, where an individual's right of privacy has been invaded there are certain other elements which may be taken into consideration in assessing the damages. Thus, where a cause of action under the civil rights statute has been established, damages may include recovery for a so-called 'property' interest inherent and inextricably interwoven in the individual's personality [citation omitted], but it is the injury to the person not to the property which establishes the cause of action."

In *Rosemont Enterprises v Urban Systems* (72 Misc 2d 788, 790, mod on other grounds 42 AD2d 544), a right of privacy cause of action was upheld despite the plaintiff's failure to allege injury to his feelings: "The instant action is quite clearly premised upon an appropriation for commercial exploitation of plaintiff's property rights in his name and career rather than upon an injury to feelings. There is no question but that a celebrity has a legitimate proprietary interest in his public personality. He must be considered as having invested years of practice and competition in a public personality which eventually may reach marketable status."

Finally, we note that the argument that the evidentiary facts offered by plaintiff bespeak a cause of action for violation of her right of publicity rather than an invasion of her right to privacy, even if valid, would not warrant dismissal of the privacy causes of action. A pleading "will not be dismissed for insufficiency merely because it is inartistically drawn." *(Foley v D'Agostino,* 21 AD2d 60, 65.) Inquiry should be directed to "whether it states in some recognizable form any cause of action known to our law." *(Dulberg v Mock,* 1 NY2d 54, 56.) "However imperfectly, informally or even illogically the facts may be stated, a complaint, attacked for insufficiency, is deemed to allege 'whatever can be implied from its statements by fair and reasonable intendment.' " *(Condon v Associated Hosp. Serv.,* 287 NY 411, 414, citing *Kain v Larkin,* 141 NY 144, 151.) "The question for us is whether the requisite allegations of any valid cause of action cognizable by the state courts 'can be fairly gathered from all the averments.' " *(Condon, supra,* p 414, citing *Moss v Cohen,* 158 NY 240, 247, and *Zabriski v Smith,* 13 NY 322, 330.)

Thus, even if we were to accept defandants' contention that an injury to plaintiff's right of publicity, exclusively proprietary in nature, is not within the purview of section 51 of the Civil Rights Law, but reposes instead in the common law, we would not be justified in dismissing the statutory right of privacy claims since the complaint may be fairly and reasonably interpreted as pleading a right of publicity claim.

Defendants argue that plaintiff's career is flourishing and that the poster portrayed her in a pose and manner of dress consistent with the public perception of her. But these are considerations which affect damages, not liability.

The admitted failure of defendant Galaxy to obtain plaintiff's written consent prior to the unauthorized sale of the poster is, in the circumstances presented herein, dispositive on the issue of liability under the Civil Rights Law. Plaintiff is therefore entitled to summary judgment on the first cause of action, which seeks a permanent injunction, and to partial summary judgment on liability on the second cause of action, which seeks compensatory and exemplary damages.

The solitary reed upon which plaintiff seeks to fasten liability on Elite and Casablancas under the Civil Rights Law is the delivery of her photograph to Galaxy. Yet, delivery of the photographs to Galaxy was an indispensable step in the production of a final product. Plaintiff admits she "agreed to participate in a shooting from which a poster may have been the result, depending of course on my judgment of the final product." Obviously, plaintiff's consent to participate in the poster project included her consent to the delivery of the photographs to Galaxy for the limited purpose of preparing a poster proof. Futhermore, plaintiff had seen preliminary proofs of the poster, was aware that such proofs could have been developed only by delivery of the photograph to Galaxy, and still voiced no objection to the project at that time. The authorized delivery of plaintiff's photographs for the limited purpose of producing a poster proof cannot now be construed as a "use" in violation of the Civil Rights Law merely because Galaxy subsequently, without consent and in apparent violation of its agreement with Casablancas, sold the poster.

Galaxy's assertion that some time prior to October 3, 1979, Casablancas advised it that he had obtained plaintiff's consent to proceed with the project is not a sufficient basis upon which to deny summary judgment to Elite and Casablancas, especially since Galaxy subsequently wrote to Casablancas on December 27, 1979 requesting written confirmation that consent had been obtained to manufacture and distribute the posters. No such confirmation was ever forthcoming. Nor did Galaxy ever pursue the request. In fact, when Casablancas, upon learning of the unauthorized sale, brought the matter to Galaxy's attention, it never sought to justify its actions on the basis of verbal authorization. Instead, it denied any sale and suggested that a few posters might have been taken from its premises. Nor did Casablancas' failure to disapprove a sample poster of plaintiff constitute his approval to the poster's distribution by virtue of paragraph 10 of the agreement. That clause, which provides that "[a]ny item submitted to [Casablancas] and not disapproved within twenty (20) days shall be deemed to be approved", has to do with quality control and in no way relates to a consent to distribtuion.

The right of privacy claims should be dismissed against Elite for the additional reason that Elite in no way contributed to or participated in the unauthorized publication. Plaintiff concedes that Casablancas acted in his personal capacity in entering into the licensing agreement with Galaxy and it was Casablancas who, in that capacity, delivered the photographs to Galaxy. On the basis of this record, Casablancas' dealings with Galaxy, performed in his personal capacity, cannot be imputed to Elite.

Liability is sought to be imposed upon Spencer solely upon the basis of its purchase from Galaxy of a quantity of plaintiff's posters for resale. The purchase was in all respects a standard commercial transaction and Spencer, at the time, had no knowledge of the lack of consent. Hence, no action for exemplary damages lies. Nor does plaintiff have a claim against Spencer for compensatory damages since Spencer has desisted from selling any of the posters. Moreover, we do not believe that the merchandiser, which is not a publisher, and which sells a product exploiting the name, por-

trait or picture of a person, without either knowledge that such exploitation is unauthorized or even notice that would prompt reasonable inquiry, has "used" that person's name, portrait or picture within the meaning of sections 50 and 51 of the Civil Rights Law so as to subject itself to liability for compensatory damages. To hold otherwise would subject such merchandiser to hazards over which it has no control, and impose upon it a burden disproportionate to the interest to be protected. (But see *Lerman v Chuckleberry Pub.*, 496 F Supp 1105, 1109-1110.) Accordingly, the second cause of action seeking damages for the use of the poster should be dismissed against Spencer. Plaintiff is, however, entitled to summary judgment on the first cause of action seeking a permanent injunction against distribution of the poster.

Summary judgment may likewise be entered against Oomi on the first cause of action. While Oomi has sold some of the posters, plaintiff fails to show that its purchase of them was other than a standard commercial transaction or that it was aware of her lack of consent. Thus, notwithstanding Oomi's default, plaintiff is not entitled to partial summary judgment on liability on the second cause of action.

Accordingly, the order, Supreme Court, New York County (SUTTON, J.), entered January 5, 1981, granting defendants' motions to dismiss the first and second causes of action should be modified, on the law, without costs or disbursements, to deny defendant Galaxy's motion and to grant defendant Spencer's motion only as to the second cause of action, to grant plaintiff summary judgment on the first cause of action against defendants Galaxy, Spencer and Oomi and partial summary judgment on liability only on the second cause of action against Galaxy and, except as thus modified, affirmed.

KUPFERMAN, J. (concurring). The opinion by my colleague, Mr. Justice SULLIVAN, is an excellent analysis, and I have a reservation only with respect to the concluding portion thereof, which has to do with the question of the liability of the distributors Spencer and Oomi. The second cause of action for damages against Spencer is dismissed

(and summary judgment against Oomi denied) because of their lack of knowledge as to the unauthorized use. (Cf. Hill, Defamation and Privacy under the First Amendment, 76 Col L Rev 1205, 1279; *Namath v Sports Illustrated*, 48 AD2d 487, 488, affd on opn at the App Div 39 NY2d 897.)

In view of the *de minimus* distribution by those two defendants, I believe that the damage claim should be dismissed. However, I do not think that we need reach the conclusion that a merchandiser with a substantial amount of unauthorized material invading privacy should or could be relieved simply because of lack of knowledge. There may well be a duty to inquire.

MURPHY, P. J., MARKEWICH and LYNCH, JJ., concur with SULLIVAN, J.; KUPFERMAN, J., concurs in a separate opinion.

Order, Supreme Court, New York County, entered on January 5, 1981, modified, on the law, without costs and without disbursements, to deny defendant Galaxy's motion and to grant defendant Spencer's motion only as to the second cause of action, to grant plaintiff summary judgment on the first cause of action against defendants Galaxy, Spencer and Oomi and partial summary judgment on liability only on the second cause of action against Galaxy and, except as thus modified, affirmed.