*929 OPINION OF THE COURT
Harold Hyman, J.
This is an action brought on behalf of the plaintiff, David Delan, by his guardian ad litem seeking to recover damages upon two causes of action. The first cause of action is for false imprisonment; the second is for the violation of plaintiff’s civil rights of “privacy” pursuant to sections 50 and 51 of the Civil Rights Law of this State.
The defendants’ answer asserts a “Second Affirmative Defense” of Statute of Limitations as to both alleged causes; it also asserts, as a “First Affirmative Defense”, that the television program complained of “was privileged under the First and Fourteenth Amendments to the United States Constitution”; as a “Third Affirmative Defense”, it pleads that “the filming and broadcast of the television program * * * was duly consented to in writing by plaintiff.”
Plaintiff moves and defendants cross-move for summary judgment. The motion and cross motion are opposed.
In order to become conversant with the factual situation, the court not only permitted extensive argument by the parties, but also directed that the defendants supply to the court and counsel a full and complete viewing of the film involved. Defendants complied with the court’s directive, thus enabling the court to view the video tape and to make its own observations.
SUFFICIENCY OF PLAINTIFF’S MOVING PAPERS ON MOTION FOR SUMMARY JUDGMENT.
Plaintiff’s motion is based upon the “primary affirmation” and “reply affirmation” of his attorney. Defendants contend that this is insufficient in and of itself and that it must be made by one having “knowledge of the facts” who must “lay bare” all the facts upon which such a motion must be based so as to prove that “as a matter of law” there is no meritorious defense to the action (CPLR 3212, subd [b]; Five Boro Elec. Contrs. Assn. v City of New York, 37 AD2d 807, affd 33 NY2d 676; Koch v Haven-Busch Co., 41 AD2d 774). Under normal circumstances, where the affirmation is made by an attorney, who appears *930 personally not to have “actual knowledge of the facts”, the application may not be entertained since such affirmation would not have any probative value and must be disregarded as hearsay (Marine Midland Bank v Hall, 74 AD2d 729; Rubin v Rubin, 72 AD2d 536; De Fren v Russell, 71 AD2d 416).
But, CPLR 3212 (subd [b]) has therein provided within its verbiage the phrase “and * * * other available proof”, upon which plaintiff movant relies. Here we have the undeniable fact and circumstance of a plaintiff being of sufficient mental illness who has for some prior period of time and at present been confined to Creedmoor Psychiatric Center, a New York State owned and operated mental health institution. Indeed, at the time of the making of this motion, he was still confined to that institution because of his disability.
The attorney’s reply affirmation specifically and unequivocally indicates a lack of personal knowledge, but he states with regard to such deficiency of,personal knowledge: “the documentary evidence submitted * * * clearly * * * lays bare for the Court all of the circumstances involved. Thus, since the factual circumstances are demonstrated * * * by documentary evidence and admissions on the part of the defendants, there is no need for an affidavit of facts by plaintiffs themselves (CPLR Sec. 3212[c] [sic]).”
In keeping with the spirit of the remedy of summary judgment, and giving a liberal interpretation to CPLR 3212 (subd [b]) herein, this court can and will consider the claimed documentary evidence referred to in movant’s attorney’s affirmations (4 Weinstein-Korn-Miller, NY Civ Prac, par 3212.09; Getlan v Hofstra Univ., 41 AD2d 830; Long Is. R.R. Co. v Grossman, 3 AD2d 763), particularly in view of the peculiar and unusual circumstances involved in the instant matter.
THE STATUTE OF LIMITATIONS DEFENSE.
The court now considers whether plaintiff’s causes of action are time barred.
Bearing in mind that the actions are for “false imprisonment” and for “violation of plaintiff’s Civil Rights (privacy) pursuant to Civil Rights Law, Sections 50 and 51”, the *931 court notes that both causes are governed in the first instance by CPLR 215 (subd 3), a one-year Statute of Limitations.
The complaint alleges that both the cause of action for false imprisonment and the cause of action for invasion of plaintiff’s privacy accrued on or about May 12, 1978, although the television broadcast took place on or about December 26, 1978. It would therefore, in the first instance, seem that since the action against the defendant CBS, Inc., was commenced by service of a summons on December 10, 1979, and upon the defendant Moyers on December 27, 1979, that the statute (CPLR 215, subd 3) would apply and that the actions would be barred. However, the court finds otherwise.
CPLR 208 provides in pertinent part that: “If a person entitled to commence an action is under a disability because of *** insanity at the time the *** action accrues, and the time otherwise limited for commencing the action *** is less than three years, the time shall be extended by the period of disability.”
On August 23, 1979, it had been judicially determined that plaintiff, “as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense” (Criminal Court Proceeding — Q 917846 — Queens County, for Assault — 2d degree — D felony — Penal Law, § 120.05). He was thereupon directed to be placed in a mental institution under the care and custody of the Commissioner of Mental Hygiene and ultimately was transferred sometime thereafter by the commissioner to the Creedmoor Psychiatric Center. The court again notes that at the time of the commencement of this action and the bringing on of this motion plaintiff was still confined at Creedmoor, and the documentary proof produced by said institution indicates a lack of any improvement.
Defendants attempt to place plaintiff’s mental condition outside the tolling statute, arguing that his condition as such is not strictly included in CPLR 208. The court does not agree that the statute requires such a strict construction. In construing CPLR 208, the court in Matter of Hurd v *932 County of Allegany (39 AD2d 499) interpreted the meaning of the word “insane”, for the purposes of such statute, to include a temporary unsoundness of mind resulting in incapacity to protect one’s rights, and that the word, “insanity” is not to be limited only to a chronic or fixed condition.
It therefore appears to the court that the Statute of Limitations defense must be stricken as a matter of law, and that partial summary judgment be granted to plaintiff in that respect. In so doing, the court at this point makes no determination as to the viability of either cause of action. Those questions are discussed below.
THE ACTION FOR FALSE IMPRISONMENT.
To sustain an action for false imprisonment a plaintiff has the burden of proof of establishing certain specific elements, namely, (1) that it was defendants’ intent to confine plaintiff; (2) that plaintiff was confined; (3) that plaintiff was conscious of being confined; (4) that plaintiff did not consent to being confined, and (5) the confinement was not otherwise privileged (Parvi v Kingston, 41 NY2d 553; Broughton v State of New York, 37 NY2d 451, 456).
In the matter at bar, the plaintiff has attempted to support his position of “confinement” by referring to the affidavit of one Dr. Fromm, which was submitted by defendants. Plaintiff infers and concludes therefrom that he, along with other patients of the psychiatric center, was confined to one room and that this constituted “restraint” or “confinement”. Both the plaintiff and defendants place reliance upon Dr. Fromm’s affidavit on the issue of “confinement”.
In analyzing Dr. Fromm’s affidavit on that issue, the court notes the following statement: “9. At all times during the filming of ‘Any Place but Here’, the patients were free to exit and enter the room where the filming was taking place. Indeed, it was CBS’s desire to minimize their interference with the normal activities of the patients. In fact, none of the patients, including David Delan, were restricted or in any way inconvenienced”.
Plaintiff also refers to a supplemental affidavit of one Rita Amatulli, which was supplied by him, and who imme *933 diately prior to and at the time of the filming was Coordinator of Volunteer Services and Public Relations at Creed-moor Psychiatric Center, and who now is a Public Educational Specialist with the New York State Office of Mental Health, New York City Regional Office, as support for his view that he was “confined” and “restrained” behind locked doors and could not leave the ward.
The afore-mentioned affidavit states in pertinent part:
“I believe that I was present on each day of the filming on the Central Queens Unit.
“On each day of the filming at the Central Queens Unit, the staff helped those clients who did not sign release forms to move to a neighboring ward.
“While the doors between wards were locked according to usual practice at Creedmoor, there was movement between wards by staff, and it was possible for patients to also move between wards when the ward door was opened by people entering or exiting for various reasons(Emphasis added.)
The court cannot and does not accept the rationalization by plaintiff’s counsel that such activity constituted a “restraint” or “confinement”. Plaintiff was free to leave the ward without being restrained for attempting to do so, and most certainly not by defendants. At best, if at all, he could only have been restrained by the State. The court does not construe Ms. Amatulli’s affidavit to state otherwise.
True it is that there then existed and has existed from some period of time long before this event, a legal “restraint” upon plaintiff because of his mental illness. But this was an “over-all” restraint not caused by defendants, not inflicted upon plaintiff by defendants, nor in which the defendants played any role. So long as plaintiff could come or go in or out of the filming portion of the premises, it cannot be said that these defendants placed any restraint upon him. Therefore, it cannot be held that he was in any way “confined” by defendants.
Plaintiff’s attorney’s rationalization of the situation and affidavits is his own mental process of attempting to devise an acceptable reason for certain acts. It is, at best, merely his belief or opinion which he has himself thus made by *934 inferences which are not justifiably to be drawn from the facts as presented.
Under the circumstances, partial summary judgment to the plaintiff upon his cause of action for false imprisonment is denied and defendants’ cross motion as to that cause of action is granted.
INVASION OF PLAINTIFF’S RIGHT OF PRIVACY.
The complaint, in pertinent part, alleges that defendant CBS was in the business of television broadcasting; the defendant Moyers was acting in the course of his employment and as agent for and at the behest of CBS (the above allegations are admitted); that Creedmoor State Hospital is operated and maintained by the Department of Mental Hygiene, of the State of New York; that plaintiff, suffering from mental illness, was, on May 12, 1978, then under the care and custody of said department in Creed-moor as a mental incompetent unable to exercise human reason; that on May 12, 1978, when the photographing-video taping of the program “Any Place but Here” was performed, it was without the permission or consent of plaintiff since he was not mentally capable and competent to grant such consent or permission but that plaintiff was caused to place his signature upon a document which purported to be his “Consent for Patient Interview”, which document was not signed or executed by an examining physician as required; that plaintiff did not know the contents of said document because he was not mentally competent or sane, or of sufficient mental capacity to execute any such “consent”; that on December 26,1978 the defendants caused such video tapes and photographs to be displayed and disseminated over their television channel and over those channels of their affiliated stations which contained the photograph of plaintiff; that such displays and dissemination was for advertising, trade purposes, and for commercial profit, without plaintiff’s consent or permission as required by section 50 of the Civil Rights Law of this State; that defendants exploited plaintiff and his disability and circumstances for personal gain; that such photographing, video taping and broadcasting was not a recounting or portraying of any current event or to any *935 past- newsworthy event; that defendants were unjustly enriched, in wanton disregard of plaintiff’s mental condition and of his civil right of privacy, for which plaintiff seeks compensatory and exemplary damages.
Primarily, it is to be noted that section 50 of the Civil Rights Law, as mentioned in plaintiff’s complaint, is a penal statute. Yet, this erroneous choice of statutory basis does not affect the cause of action since a complaint, even if inartistically drawn, will not be dismissed (Foley v D’Agostino, 21 AD2d 60, 68) but shall be liberally construed if it gives sufficient notice to defendants of the transactions and occurrences sought to be established and no substantial right is prejudiced (Cabin v Community Newspapers, 50 Misc 2d 574, affd 27 AD2d 543). Inquiry should be directed to whether the pleading states in some recognizable form any cause of action known to our law (Dulberg v Mock, 1 NY2d 54, 56; Harden v Auberge Des Fougeres, 40 AD2d 98). A complaint is deemed to allege “whatever can be implied from its statements by fair and reasonable intendment” (Condon v Associated Hosp. Serv. of N. Y., 287 NY 411; Kain v Larkin, 141 NY 144, 151). The question is whether the requisite allegations of any cause of action cognizable by State courts “ ‘can be fairly gathered’ ” from all the averments (Condon v Associated Hosp. Serv. of N.Y., supra, p 414; Moss v Cohen, 158 NY 240, 247; Zabriskie v Smith, 13 NY 322, 330).
In order to place this action for alleged invasion of plaintiff’s “right of privacy” in its proper perspective it must first be noted that in this State no such common-law right existed (Kiss v County of Putnam, 59 AD2d 773). If such right does exist, it does so by reason of existing statute (Roberson v Rochester Folding Box Co., 171 NY 538; Kiss v County of Putnam, supra; Civil Rights Law, § 51). The latter section (derived from L 1903, ch 132, § 2, as enacted by L 1909, ch 14, as amd by L 1911, ch 226, and L 1921, ch 501) provides in pertinent part: “§ 51. Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained *** may maintain an equitable action * * * against the person, firm or corporation so using his name, portrait or picture, *936 to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person’s name, portrait or picture in such manner as is forbidden or declared to be unlawful by the last section [CPLR 50], the jury, in its discretion, may award exemplary damages.”
The law is well settled that under sections 50 and 51 of the Civil Rights Law “written consent” is required before a person’s name or photograph may be used for trade or advertising purposes (Roberts v Condé Nast Pub., 286 App Div 729; Adrian v Unterman, 281 App Div 81, 88, affd 306 NY 771). To contend, as defendants do, that plaintiff was of a mental condition to enable him to knowledgeably understand the true and full nature of his act of executing a consent, is ludicrous in view of the subpoenaed medical records from the Creedmoor Psychiatric Center indicating the history of plaintiff’s mental condition. That history dates back as far as 1966 when he exhibited “delusions”, “auditory hallucinations”, “aggressive behavior” and “acting out behavior”. At the time of his initial admission to Creedmoor on October 3, 1972, plaintiff was diagnosed as “schizophrenic, catatonic type”. On his second admission to Creedmoor on March 4, 1975, plaintiff was diagnosed as “schizophrenic, paranoid type”. Plaintiff was thereafter transferred to Mid-Hudson Psychiatric Center on June 30, 1976, his condition diagnosed as “unimproved”. On February 4, 1977, he was transferred to Creedmoor and then discharged on May 23, 1977. He was readmitted to Creed-moor on October 31, 1977 by being brought to the emergency room after having been found by the police to be “running around nude”. The record indicates that upon his readmission, plaintiff was “agitated, actively psychotic” and “dangerous to himself and others”. As late as April 28, 1978 he was “very agitated and confused”, and on May 2, 1978, 10 days before the actual filming and alleged execution by plaintiff of the written consent form, he had “not showed [sic] much improvement”, exhibiting, “very aggressive and hostile” behavior, subject to “incredible mood swings”. On July 10,1979, he was discharged to the police department on criminal charges and thereafter, on August *937 23,1979, as a criminal defendant (People v Delan, Criminal Ct, Queens County, Docket No. Q 917846) was judicially determined “as a result of mental disease or defect”, to lack the capacity to understand those proceedings against him or to even assist in his own defense. He was thereupon committed “to the care and custody of the Commissioner of Mental Hygiene for care and treatment in an appropriate institution of the Department of Mental Hygiene.” It was further directed “that if the person in charge of the institution in which the defendant [plaintiff herein] is confined determines at any time that defendant is no longer an incapacitated person”, that “such person shall give notice in writing of such determination to this Court” for further proceedings. It appears he was eventually readmitted to Mid-Hudson sometime thereafter, and later transferred to Creedmoor on a civil status on January 4, 1980 where he remained until August 21,1980 when he was discharged to the Department of Corrections and placed in Kings County Psychiatric Prison. On September 23, 1980, he was readmitted to Creedmoor.
From the foregoing history there can be no denial that since 1972 plaintiff has been institutionalized by the State in two mental health facilities for more than 5 V2 years prior to the date of the alleged execution of the “consent form”, and that such set of circumstances were existent on December 26, 1978 when his picture and image was shown and disseminated by the defendants over Channel 2 and its affiliated television stations.
That plaintiff obtained sufficient mental capacity to consent or even to defend himself or to aid in his defense has never been certified by the commissioner or any of his staff since his incarceration for mental illness. Plaintiff has consistently remained institutionalized under the care and treatment of the medical-psychiatric staff of those institutions, particularly Creedmoor.
To hold that plaintiff was mentally capable of understanding and consenting to a matter of this nature is to also say that he had similar capacity to defend or aid in his defense, a finding or determination never before made at the time of or even after the so-called “consensual execution”.
*938 Even the “Consent for Patient Interview” dated May 12, 1978, claimed to have been executed by plaintiff, is devoid of any signature by a “physician” who was required to have conducted the interview and which by its own phraseology, had to first examine the patient to determine whether said plaintiff was capable of executing the so-called “Consent”. The fact that such form did not contain the required signature of the examining “physician-witness” was sufficient to alert the defendants and to place them on guard against obtaining a video tape of plaintiff and to later disseminate it over television. For defendants to act in utter disregard of such obvious requisite was to subject themselves to whatever liability might ensue thereafter.
It may be that defendants relied upon the determination of one David M. Fromm, who describes himself as a “doctor of psychology”; but such misplaced reliance is certainly not available to defendants in an attempt to avoid the specific requisites with regard to the “Consent” form. The “Consent” form required and provided that the mental patient’s consent be witnessed and that “the witness must be a physician who has conducted an interview and examination of the patient and [who has] determined that the patient is capable of executing the consent and is doing so willingly as his own voluntary act”. The dictionary definition of “physician” is “one duly authorized to treat disease: a doctor of medicine” (Webster’s Third New International Dictionary [1961 ed], p 1707). A “psychiatrist” is defined as “a physician specializing in psychiatry”, “psychiatry” being “a branch of medicine that deals with the science and practice of treating mental, emotional, or behavioural disorders” (Webster’s Third New International Dictionary [1961 ed], p 1832). On the other hand, a “psychologist” is one who engages in the science of the human mind and its aspects, powers and functions, and who is able to make a systematic investigation of mental phenomena. But having obtained a doctorate in the field of psychology does not concomitantly obtain a license or authorization to treat mental diseases or qualify as someone versed in the art of medicine or healing; nor does it legally place such person in the position of a duly licensed physician. That is not to say that the field of psychology is not a worthy one. To the *939 contrary, it has an important purpose and function in our modern society. The necessity to highlight the distinctions in qualifications is required, however, to understand the relevance of the Fromm affidavit relied upon by defendants.
It cannot, therefore, be said that plaintiff’s so-called “written consent” may have the court’s judicial sanction.
On the question of the alleged “oral consent” obtained from plaintiff, even if the court was to accept as true plaintiff’s sufficient mental capacity to give such, his oral consent, nevertheless, falls short as a complete defense. At best, it serves as only a partial defense relevant to the issue of and in mitigation of damages (Lomax v New Broadcasting Co., 18 AD2d 229).
Section 51 of the Civil Rights Law has been liberally construed since its enactment so as to grant to the individual the right of privacy and immunity from commercial exploitation (Flores v Mosler Safe Co., 7 NY2d 276, 280-281; Lahiri v Daily Mirror, 162 Misc 776, 779). The news media cannot enshrine to itself any favored position with respect to its news-gathering activities. The First Amendment right to free exercise of speech or of the press does not carry any inherent unrestricted right to gather information. Undoubtedly, the news media has no special immunity or privilege under the First Amendment to invade the rights and liberties of others (see Houchins v KQED, Inc., 438 US 1, 8-16; Pell v Procunier, 417 US 817, 829-835; Branzburg v Hayes, 408 US 665, 684).
In Galella v Onassis (487 F2d 986, 995-996) it was held that, “Crimes and torts committed in news gathering are not protected *** There is no threat to a free press in requiring its agents to act within the law.” (See, also, Le Mistral, Inc. v Columbia Broadcasting System, 61 AD2d 491, app dsmd 46 NY2d 940.)
This court, like the appellate court in Le Mistral, Inc. (supra), “recognizes that the exercise of the right of free speech and free press demands and even mandates the observance of the coequal duty not to abuse such right, but to utilize it with right reason and dignity.” (Bavarian Motor Works v Manchester, 61 Misc 2d 309, 311.) “Clearly, *940 the First Amendment is not a shibboleth before which all other rights must succumb.” (Le Mistral, Inc. v Columbia Broadcasting System, supra, p 494). This must include the civil rights of the mental incompetent whose very vulnerability to exploitation makes it absolutely necessary to obtain a valid “written” consent in order to protect him from violation of his rights, and most importantly, his right to be free from invasion of privacy.
This restriction on the liberties of the individual and press is at times necessitated by the abuse of liberty which infringes on the rights of free citizens, and too often those who are helpless and misfortunate among us.
“[T]he fact that a liberty cannot be inhibited without due process of law does not mean that it can under no circumstances be inhibited.
“The requirements of due process are a function not only of the extent of the governmental restriction imposed, but also of the extent of the necessity for the restriction.” (Zemel v Rusk, 381 US 1, 14.)
Defendants contend that if any intrusion took place it was only slight in degree, “de minimus”; that the scope of the invasion should be placed in balance against the public interest served. Thus, they contend that the degree of intrusion sought to be justified when measured against the newsworthiness for public interest purposes would present a jury question of privilege; any other approach, they argue, would “border upon prior restraint”.
That same argument was presented to the court in Anderson v WROC-TV (109 Misc 2d 904, 909) in which the court responded: “While the argument appears persuasive on the surface, it does not, on deliberation, hold water. Assessing the degree of the intrusion against the newsworthiness of the story is a test that is too vague and subjective to counterbalance the predominant interest served in protecting the rights of individuals in a free society against invasion of their privacy or their home. As noted by one commentator: ‘Even if the information sought were considered especially important, an ad hoc balancing test would seem improper since it would determine the lawfulness of the means of gathering according to the end *941 value of the information gained in each case. Moreover, it would often be difficult to determine if the activity at issue was pursued with the ultimate objective of obtaining information, and any measurement of the value of the information obtained would involve vague, subjective criteria.’ (Note, The Rights of the Public and the Press to Gather Information, 87 Harv L Rev 1505, 1515).”
Plaintiff contends that more than a mere gathering of information was pursued. Rather, the activity had as its ultimate objective the use of the video tape for trade purposes. Since even a public figure does not surrender all right to privacy, but retains the independent right to have his personality, no matter how newsworthy, free from commercial exploitation at the hands of another (Brinkley v Casablancas, 80 AD2d 428; Booth v Curtis Pub. Co., 15 AD2d 343, 352, affd 11 NY2d 907), should this independent right be any less with respect to one who is confined to a mental institution?
In considering the facts at bar, the defendants’ counsel admitted at the viewing of the video tape held before this court that there were commercial breaks during portions of the show as is common when such is presented on the television to the public. In addition, it was also admitted that, “By experience CBS News has learned that many of its CBS Reports are sought from time to time by educational institutions, civic organizations, hospitals and libraries. In order to make those worthwhile broadcasts available to such entities, CBS News entered into license agreements with Carousel Films, Inc. [hereinafter referred to as Carousel] whereby the latter may distribute 16 mm film prints for certain limited and specified uses. On or about February 1, 1979 such a license was granted with respect to CBS Reports ‘Any Place But Here’. *** the prints may not be used in motion picture theatres, auditoriums or other places of public assembly to which an admission fee is charged.”
Absent from the above statement is any information as to whether such a license to Carousel by defendants was gratuitous or that Carousel in distributing prints did so without seeking some form or amount of remuneration. As a matter of fact, any such agreement has not been made *942 part of defendants’ papers. This court is not obliged to read into such statement that Carousel is a philanthropic, not-for-profit organization and that it distributed the film without remuneration. On the other hand, it can be inferred that Carousel, appearing to be a separate and distinct business entity, obtained such a license for which it was required to pay a fee and that it distributed the print not only for a fee but for profit as well.
Moreover, even if plaintiff’s consent was valid, as alleged by defendants, he never authorized distribution of the video tape, nor did he authorize dissemination beyond that one showing, nor consent to further use of any kind or use for commercialization. The mere fact that plaintiff may have voluntarily, on this one occasion, surrendered his right of privacy for monetary reward or gratuitously, does not forever forfeit his privacy right for all who would engage in commercial exploitation. (Booth v Curtis Pub. Co., supra.)
Finally, within the ambit of plaintiff’s complaint, there is yet another right allegedly violated, to wit: the “right of publicity”, a right held to be subsumed in sections 50 and 51 of the Civil Rights Law. (See Brinkley v Casablancas, supra.)
This so-called right of publicity is protected under the umbrella of the right of privacy, involving as it does the use of plaintiff’s protected right for defendants’ direct commercial advantage. As opposed to the right of privacy which seeks to minimize the intrusion or publication of the damaging matter, in contrast the right of publicity is of a proprietary nature and focuses on the exploitation of plaintiff’s name or likeness for the benefit of others.
In Gautier v Pro-Football (304 NY 354, 359) it was recognized that, “[W]hile one who is *** presently newsworthy may be the proper subject of news or informative presentation, the privilege does not extend to commercialization * * * through a form of treatment distinct from the dissemination of news or information”. Likewise, as stated in Brinkley v Casablancas (supra, p 440): “the statute does not distinguish between the private person for whom injured feelings may be the paramount concern and the *943 public figure whose right of privacy is limited in any event by public interest considerations, but whose economic interests are affected by the wrongful exploitation of his or her name or likeness. The wrong consists of only two elements: the commercial use of a person’s name or photograph and the failure to procure the person’s written consent to such use. The damages that flow from the confluence of these two events should be compensable whether the injury is to one’s feelings or to his ‘property’ interest. Both injuries are caused by the same wrong and should be redressed by the same cause of action.”
In conclusion, this court finds that the commercial exploitation of this CBS Report by use of the video tape of the picture of plaintiff, for trade purposes, constituted an unprivileged invasion of both his right to privacy and right to publicity. Accordingly, under the factual and documented circumstances presented on the motion and cross motion for summary judgment concerning plaintiff’s cause of action for violation of his civil rights, plaintiff is granted partial summary judgment and the defendants’ cross motion is denied to that extent. The “First”, and “Third” affirmative defenses interposed in defendants’ answer are thus stricken.
The issue of damages shall be set down for an assessment before the Justice presiding in Trial Term, Part 1, subject to compliance with the applicable calendar rules.