**William J. DeCLEMENTE, Plaintiff,**

v.

**COLUMBIA PICTURES INDUSTRIES, INC., Jerry Weintraub Productions, and Jerry Weintraub, Defendants.**

No. CV 91–3256 (ADS).

United States District Court, E.D. New York.

July 29, 1994.

Collins & Berman (Henry F. Collins, of counsel), Toms River, NJ, Lackenback Siegel Marzullo Aronson & Greenspan, P.C. (Howard N. Aronson, Robert Golden, of counsel), New York City, for plaintiff.

Pryor, Cashman, Sherman & Flynn (Stephen F. Huff, Jamie M. Brickell, Narciso F. Saavedra, of counsel), New York City, for defendants.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge:

This case concerns the origin of a best selling motion picture "The Karate Kid" and its two sequels, among other interesting is-

sues of intellectual property law. The plaintiff William J. DeClemente ("the plaintiff" or "DeClemente"), now residing in New Jersey, claims he is the original Karate Kid, and has brought an action against the producers and distributor of the "The Karate Kid" films pursuant to sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), for service mark infringement, and pursuant to New York Civil Rights Law § 51, for violation of his right of publicity. In this jury trial, the defendants move at the close of their case for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a), and to dismiss the plaintiff's complaint.

### Motion for a Judgment as a Matter of Law:

A motion for a judgment as a matter of law, is governed by Rule 50(a)(1) of the Federal Rules of Civil Procedure which Rule was revised in 1991 to abandon the familiar terminology of a motion for the direction of a verdict, a motion to dismiss at the end of the plaintiff's case, or at the end of the entire case. However, the change in terminology affects no change in the familiar standards of the rule. Rule 50(a)(1) states, in relevant part, that:

> [i]f during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue.

In explaining this standard, the Second Circuit has recently reiterated that:

> the district court may grant the motion "only when, viewing the evidence most favorably to the party other than the movant, 'there can be but one conclusion as to the verdict that reasonable men could have reached.'" Diebold v. Moore McCormack Bulk Transp. Lines, Inc., 805 F.2d 55, 57 (2d Cir.1986) (quoting Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d 163, 167 (2d Cir.1980)). The nonmovant must be given the benefit of all reasonable inferences, because the trial court "cannot assess the weight of the conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury." Mattivi, 618 F.2d at 167.

Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 59–60 (2d Cir.1993); see also Kreppein v. Celotex Corp., 969 F.2d 1424, 1426 (2d Cir. 1992); Michelman v. Clark–Schwebel Fiber Glass Corp., 534 F.2d 1036, 1042 (2d Cir.), cert. denied, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).

█ Accepting the plaintiff's evidence as true and giving the plaintiff the benefit of all reasonable inferences, when there is a complete absence of evidence to support any finding by the jury in favor of the plaintiff, then the Court must grant a judgment as a matter of law at the conclusion of the plaintiff's case, or the entire case, since there is no issue of fact to submit for the jury's determination. Weldy, 985 F.2d at 59–60.

It is based upon these legal principles that the Court examines the defendants' motion for a judgment as a matter of law at the conclusion of the plaintiff's case, decision having been reserved, and at the end of the entire case.

### The Trial

The plaintiff was born on September 14, 1945; was thirty-nine years of age in 1984 and is presently forty-eight years of age. According to the evidence presented at the trial, DeClemente first began learning karate in 1963, in Queens, New York, at the age of seventeen. The style of karate he learned was Shorin–Ryu, which is a style of Okinawan karate. In 1964, the plaintiff's instructors Jimmy Fitzgerald and Ernie Ferrera nicknamed him the "The Karate Kid." By 1965 or 1966, the plaintiff continued his training and began to teach karate to others, first in his parents' basement and later in Brooklyn. The name of the karate school (called a "dojo") he operated was named "The Karate Kid Dojo," and he signed the certificates of promotion he issued to advancing students as "The Karate Kid." The plaintiff also trained along the beach at Riis Park and Plum Beach.

At this trial DeClemente testified that he developed an unusual training technique

which is waxing a car in a clockwise manner, to develop strength in the shuto; which is a "knife-hand block." He also used a move "like you are painting a fence" which is a rising wrist-block.

The plaintiff met a person he believed to be Robert Kamen at the World's Fair in the mid–1960s and this person came to the plaintiff's parents' basement "on a number of occasions" over a two-week period "to watch karate." This apparently occurred in 1964 or 1965. The plaintiff never had any contact with this person again. He did not know Robert's last name but he was identified in a photograph as having bushy sideburns. Robert never trained with the plaintiff, "he watched."

As to the number of persons in his karate group, the plaintiff testified "we have over, probably 100 people over the years, not all at one time." He clarified this testimony by saying, "maybe over a period of two years I instructed over 100 people, but the group usually was ... between 15 and 20, maybe 25 people." The plaintiff conceded that "I was a small businessman. I wasn't really a success. I did it out of love rather than financial reward."

DeClemente ˙ entered the United States Army in or about December 1965 and was in service for some unstated period of time. When he returned from the Army, the plaintiff opened a storefront karate school called "The Karate Kid Dojo" on 65th Street in Brooklyn. DeClemente made up business cards in the late 1960s, when he was teaching on which it was stated that Okinawan karate instructed by Bill DeClemente "The Karate Kid." Also, the sign on the Brooklyn storefront was "The Karate Kid Dojo." The plaintiff had approximately 20 students at all times in the Brooklyn store, including his earlier students such as Anthony Calabro and Andrew Garofalo. The business in this Brooklyn store lasted for approximately two years.

At that time, the karate industry was in its infancy, with very few karate schools. It was a small community. There were "maybe seven or eight schools" in all the five boroughs of New York, including four in Queens.

After the storefront in Brooklyn closed, the plaintiff went back to his grandparents' basement to teach. However, karate wasn't doing that well for DeClemente and he entered into the health club business. He managed various health clubs in Queens and Manhattan and also taught karate, in the early 1970s. In his health club work, he gave karate exhibitions and used the name "Bill DeClemente, the Karate Kid." He purchased a health club or gym in 1976 and continued teaching karate.

DeClemente remained in the New York City area until 1977, when he moved to Florida. He managed a spa in Florida, owned two others, and continued to teach karate, using the name "The Karate Kid" on his business cards and other printed matter.

In 1984, "The Karate Kid" movie was released. The defendants Jerry Weintraub and Jerry Weintraub Productions (collectively "Weintraub") produced the film, and the defendant Columbia Pictures Industries, Inc. ("Columbia") distributed the film. Sequels to the movie were released in 1986 called The Karate Kid II, and in 1989 called The Karate Kid III. According to the plaintiff, the following similarities exist between the plaintiff and the young teenager named Daniel LaRusso who stars as the "Karate Kid" in the films:

1. The use of the name "The Karate Kid" as the title of the film, to refer to an Italian–American teenager who resembled the plaintiff when Mr. DeClemente was 17 years old;

2. The style of karate studied by the "Karate Kid" character in the movie is the same Okinawan karate style learned and subsequently taught by the plaintiff: Shorin–Ryu. This style represents less than 5% of the kind of karate taught in the United States, and it is the same style which Robert Mark Kamen allegedly saw DeClemente perform during his attendance at the plaintiff's Dojo for two weeks in the mid–1960s;

3. Both the Karate Kid movie character and the plaintiff practiced Karate using the same technique, known as "kata." (kata is the practice of karate by performing forms

of different punch, block and kick combinations);

4. Both the Karate Kid movie character and the plaintiff developed strength and technique by waxing cars and painting fences;

5. Both the Karate Kid movie character and the plaintiff trained at the beach.

6. The tough ex-Marine character resembled his friend Ed McGrath.

7. The real Miyagi, now deceased, was an Okinawan legend.

DeClemente saw the credits of the movie stated that the screenplay writer was Robert Mark Kamen, and he was "quite certain" that this was the "Robert" with the bushy sideburns. However, notwithstanding his reactions, he did nothing after the release of the 1984 movie "The Karate Kid."

The second movie, Karate Kid II was released in 1986. This movie contained less similarities than the original film. Again, the plaintiff made no complaint to anyone.

After the first two movies, the plaintiff conceded that he tried to capitalize on the name made popular by the movies. In this regard, although the plaintiff contends that he developed the name, The Karate Kid, significantly, his use of the name was not widely circulated. For example, DeClemente testified, as follows:

"Q You mentioned a tour show. Can you explain that to us, please?

A After the movie came out, there was a lot of interest in the name that I had developed. Although I used it at a small capacity—" (Tr. at p. 109).

The plaintiff did a tour show in September 1987 in Columbia, South Carolina, which was advertised as "The Karate Kid Tour Show and Exhibition" with DeClemente (the original Karate Kid), "including the real Mister Miyagi" (Plaintiff's Exh. 18). In the flier for the show there was an advertisement to sell "Karate Kid Tour shirts." There is no doubt that the plaintiff endeavored to capitalize on the highly favorable publicity generated by the Karate Kid movies.

Unfortunately, the tour show lost money as did most of DeClemente's endeavors. As an example of "reverse confusion" the plaintiff testified that people challenged him "constantly ... you have to go into a whole explanation." Apparently, DeClemente meant that people questioned whether he was The Karate Kid, because of what they saw in the movies. Even though, as he testified himself, he tried "to capitalize on my name," things just weren't working out.

After The Karate Kid Tour in 1987, the plaintiff participated in a small show in North Carolina; in a number of Karate Kid training centers and in Karate Kid training videos, one of which was played for the Court and jury. The plaintiff also had four or five Karate Kid training centers in New Jersey. The plaintiff also sold some wearing apparel at his karate school, again as he stated "in a very small capacity."

The plaintiff explained another instance of this alleged "reverse confusion" in 1990 when he engaged in a fight with one Vic Marini who "challenged" his right to use the name Karate Kid. Although the plaintiff generalized about being accused of being an Elvis Presley "look alike," he admitted that Marini never used those words.

DeClemente concedes that the Karate Kid film does not portray his face or his name, nor is it the story of his life; that he was not taught by an Oriental sensei; that he was raised in Queens County and not by a single parent in California; and, of course, that he was thirty-eight years old when the movie was shown.

Further, DeClemente conceded that the term "The Karate Kid" or "Karate Kid" was used by other persons. There is evidence that he knew that DC Comics used the name The Karate Kid and that others used the name.

The plaintiff then retained attorney Myron Amer, and on November 15, 1988, the plaintiff registered "The Karate Kid" as a service mark with the United States Patent and Trademark Office ("PTO"). Register No. 1,513,099. The date of the first use was stated by the plaintiff to be August 1, 1968, and is so marked on the certificate. The service mark registration states that the mark is for the purpose of "organizing and

conducting karate exhibitions, in class 41." Class 41 refers to the entertainment field. The plaintiff never stated on the application that Columbia Pictures used the same name in its two films prior to his application, nor did he state that DC Comics also used the same name, notwithstanding that recognition was given to DC Comics by Columbia Pictures in the film credits.

The plaintiff first contacted Columbia Pictures in August 1990, some six years after the release of the first movie. He wrote a letter to Columbia Pictures, dated August 13, 1990. The Court notes, because it has been raised, that the letterhead on which the letter is written states "Karate Kid" not *"The* Karate Kid." In the letter the plaintiff did not object to the use of the name The Karate Kid, by Columbia Pictures. The purpose of the letter was to enclose a synopsis of a script to relieve the defendants "of the high priced actors, Pat Morita and Ralph Macchio." In this letter nothing was mentioned of the "reverse confusion" allegedly suffered by the plaintiff. Columbia Pictures later responded that it could not get involved in unsolicited material.

On February 1, 1991, Clifford G. Frayne, another attorney consulted by the plaintiff, wrote to Columbia Pictures, relating the similarities in the plaintiff's lifestyle to the Karate Kid in the movie, advising Columbia of the plaintiff's trademark and giving notice to the defendant "should you intend to develop any further sequels" (Plaintiff's Exh. 34 in evidence). Again, no claim of reverse confusion was made.

Apparently, Columbia Pictures actively protected the name "The Karate Kid." On May 15, 1991, Columbia Pictures wrote to a Karate Kidd Company in Indianapolis, Indiana, requesting that the company cease and desist from using the phrase "Karate Kidd." (Plaintiff's Exh. 67).

Thereafter settlement negotiations commenced between the plaintiff and Columbia Pictures which were unsuccessful. Subsequently, plaintiff initiated this action on August 27, 1991.

The plaintiff also called a number of witnesses who were his friends and colleagues in karate activities and training. Edward F. McGrath testified that the plaintiff used the name The Karate Kid at the age of seventeen. Robert Kamen studied with McGrath for three or four years. McGrath "imagines" that Robert Kamen was in the dojo when the plaintiff came in and introduced himself as The Karate Kid. When he saw the movie he was reminded of the plaintiff when he was a youngster but could not identify the style of karate used in the movie. However, he did not think that DeClemente competed in tournaments. Significantly, McGrath further testified:

"Q When you saw the movie and you said the name Karate Kid reminds you of Mr. DeClemente and some of the other things you told us about, the appearance, did you look to determine if he had any connection with the movie?

A No. It just didn't occur to me at that time.

. . . .

Q Did you recognize the name of Robert Kamen, the author of the movie?

A I didn't even notice it. I would recognize it if I had seen it on the screen, but I didn't notice it" (Tr. at p. 175).

McGrath further testified that he did not see the plaintiff and Kamen together.

"Q And do you specifically recall whether you ever saw Mr. Kamen and Mr. DeClemente together?

A No.

Q Were you asked to provide a statement in this case to the effect that you knew that Robert Kamen knew Mr. DeClemente and knew him by that nickname?

A There was—I can't remember the name of the lawyer for Mr. DeClemente at the deposition—

Q Yes?

A —But that lawyer presumed that that had happened and then as he was talking to me told me—and you'll be able to link the two of them together having seen each other. I said no, I wouldn't do that.

Q So Mr. DeClemente's former lawyer asked you if you could link the two together and you said no, you couldn't?

A I think he presumed that I knew they had seen each other and were shaking hands and were close friends, and I wasn't going to say that" (Tr. at pp. 184–185).

McGrath also confirmed that as to the size of the karate industry, "we were a very small community" (Tr. at p. 187). As to the impact of the movie, McGrath was of the opinion "it had an impact on letting people know more about karate" (Tr. at p. 189).

Arnold G. Zuckerman and Andrew Garofalo knew the plaintiff as The Karate Kid. When Garofalo first saw the movie, he had an interesting reaction. He said "I thought that Billy had finally done well." Garofalo confirmed that the plaintiff's Brooklyn school closed in 1969 because it did not make money, obviously unrelated to the 1984 motion picture.

Anthony Calabro testified that the plaintiff's original nickname was "Billy the Kid" later changed to "The Karate Kid." He worked out until 1969. He also described the size of the karate community in the late 1960s.

"Q Can you describe for us what the karate community was like in the late '60's?

A It was a small community, not that many people took karate, and when you did take it you got to know everybody that took it.

Q You knew other karate practitioners in your area?

A In Brooklyn, I knew none in Brooklyn.

Q Where did you know them, if any?

A In Queens where—most of the people that I met in karate were down at the school and everybody seemed to pass through there" (Tr. at pp. 364–365).

Calabro saw "Robert" at the plaintiff's school in the summer of 1965. Robert did not join the school. He corroborated the similarities in the movie pointed out by the plaintiff. However, Calabro also did not recognize the style of karate used in the movie.

David W. Brodecki is a supervisor in a trucking firm who also teaches karate. He met the plaintiff in 1991 and entered into a licensing agreement to use the name the Karate Kid Training Center. He used the plaintiff's Karate Kid instructional video. Surprisingly, after he began using the name The Karate Kid, his "walk-in customers just disappeared." Apparently, he was challenged by other instructors about his use of the name The Karate Kid and he ceased paying the plaintiff the license charge.

Interestingly, the enhancement of the plaintiff's use of the name The Karate Kid as a result of the movie was elucidated by Brodecki, as follows:

"Q Why did you think changing the name to "The Karate Kid" would increase your business?

A It was very popular at the time.

Q And do you know how it became popular?

A The movies.

Q Did you want people to think that you were affiliated with the movies?

A That's an interesting question. The only way I can answer that I wanted to be affiliated with the 'Karate Kid.'

. . . .

Q Did you know whether Mr. DeClemente had been successful in marketing the name 'The Karate Kid' himself?

A I had no knowledge of that.

. . . .

Q Were you attempting to get the benefit of the publicity that the motion picture had given the words 'The Karate Kid'?

A I would say I was trying to get the influx of people from the name 'The Karate Kid,' irregardless whether it was from the movie or from the massive things that Mr. DeClemente had done.

Q Did Mr. DeClemente make any representations to you about how successful his business had been?

A No, not—I really didn't get involved in that" (Tr. at pp. 403, 404).

As to any monetary gain or loss to the plaintiff as a result of the licensing with the plaintiff, Brodecki testified in an unclear manner, as follows:

"Q Did you actually pay a licensing fee to Mr. DeClemente for the use of the name?

A Yes, sir.

Q How much was that?

A It was $900 initially. It was for the money I had to put down. But he did waive that because he didn't feel that way, and that it was $100 for each month which I would pay on the 23rd of each month.

Q Do you know whether Mr. DeClemente had previously licensed the name to anybody else?

A I had no knowledge of that" (Tr. at p. 405).

How many months he allegedly paid this license fee, if any, was not adduced.

Robert W. Wainwright is a physical therapist in New Jersey. He met the plaintiff in the fall of 1990 when he took karate lessons in the plaintiff's school in Point Pleasant. Wainwright invested some money, again in an unstated amount, in the plaintiff's Karate Kid Enterprise. The business was unsuccessful. The initial mail-back releases were very poor "and they decided to 'scrap the project.'" The plaintiff worked for Wainwright in his sports clinic and was paid $100 a day plus expenses and commissions on equipment sold. However, when it came to the use of the name "The Karate Kid" there was disbelief that he was the original Karate Kid, and in one convention he said it became a laughing matter. As a result, Wainwright stopped taking DeClemente to the business conventions. No details were furnished as to how long, if ever, the plaintiff was paid $100 per day.

The Court will not review the evidence introduced in the defendants' case. However, there was testimony adduced that Columbia Pictures entered into a license agreement with DC Comics for the use of the name The Karate Kid and that one William Robert Sasner was a young, black belt karate specialist that Columbia Pictures used as a model for the Karate Kid.

### The Complaint

With respect to his first cause of action for service mark infringement, the plaintiff alleges that the defendants' Karate Kid movies infringed upon his service mark by "misappropriating and unfairly commercially exploiting the allure, attraction, and appeal of the mark and the titles of their Karate Kid films." With respect to the plaintiff's second cause of action stating that the defendants have violated his right to publicity, the plaintiff alleges that the defendants' Karate Kid movies publicize his persona as evidenced by the service mark, and have caused the plaintiff humiliation, embarrassment, and mental anguish in his attempts to exploit the service mark. The plaintiff seeks compensatory and punitive damages, an injunction restraining the defendants and their associates from any further prospective use of the name "The Karate Kid" in subsequent films, and attorneys fees.

On December 10, 1993 the Court denied the defendants' motion for summary judgment, finding that triable issues of fact were raised with respect to the service mark's secondary meaning and consumer confusion. The defendants' motion for reargument was heard on January, 10, 1994, and was also denied. A jury trial commenced on July 13, 1994.

### I. THE PLAINTIFF'S SERVICE MARK INFRINGEMENT CLAIM.

According to the complaint, the plaintiff has brought this cause of action for infringement pursuant to sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a). Section 32(1) applies to claims for infringement of a registered mark. Section 43(a) protects against false designations of origin and false descriptions or representations, whether or not a registered mark is involved. *Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 212 (2d Cir.1985). Apparently, the plaintiff contends that the infringement here is of the plaintiff's registered service mark relating back to use starting in the 1960s.

The law in this Circuit regarding trademark infringement is intricate and complex, to say the least. In order to determine whether a plaintiff's service mark has been infringed upon under the Lanham Act, a court must conduct the following two-

pronged test and determine: (1) whether the plaintiff has a mark that is protectable under the trademark laws, and (2) if so, whether the defendant's allegedly infringing mark is likely to cause consumer confusion. *See Two Peso, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1039 (2d Cir.1992); *Yarmuth–Dion, Inc. v. Dion Furs, Inc.,* 835 F.2d 990, 992–93 (2d Cir.1987).

■ However, if the service mark or trademark is registered with the PTO, there is a rebuttable presumption that the mark is protectable—namely, as explained below, that the mark is more than "descriptive." *See, e.g., Papercutter, Inc. v. Fay's Drug Co., Inc.,* 900 F.2d 558, 562–63 (2d Cir.1990). This presumption, however, has two aspects.

The first aspect is that pursuant to section 33(a) of the Lanham Act, 15 U.S.C. § 1115(a), registration of the mark is "prima facie evidence of the registrant's exclusive right to use the registered mark in commerce." The burden then shifts to the defendant to rebut this presumption of exclusive use by showing that the registered mark is merely descriptive, and therefore not the sole monopoly of the mark owner. *See Papercutter,* 900 F.2d at 563; *20th Century Wear Inc. v. Sanmark–Stardust Inc.,* 747 F.2d 81, 88–89 n. 8 (2d Cir.1984) (*cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985)).

■ The defendant has five years after the registration to make this challenge. After five years of continual use of the registered mark in commerce, and subject to a variety of exceptions that are discussed later in this opinion, the mark becomes "incontestable." 15 U.S.C. § 1065. Upon becoming incontestable, the mark cannot be challenged on the basis of being descriptive. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).

■ The second aspect of the presumption is that the first prong of the test for infringement may also be presumed, if the PTO registered the mark because the mark had acquired secondary meaning. *See 20th Century Wear,* 747 F.2d at 89 n. 8; *Papercutter,* 900 F.2d at 563. Although the Lanham Act provides that no trademark shall be refused registration unless it consists, among other things, of a descriptive mark, *see* 15 U.S.C. § 1052(e), the converse is not true: namely, that every registered trademark is more than merely descriptive. If that were so, there would not be a need for the presumption of validity. As a result, the Second Circuit has held that, absent consideration of secondary meaning by the PTO when registering the mark, the burden remains with the plaintiff to show that the mark has acquired secondary meaning. *20th Century Wear,* 747 F.2d at 89 n. 8 ("We hold that in the absence of evidence that the Patent and Trademark Office registered the mark because of its secondary meaning, 15 U.S.C. § 1052(f), registration does not shift the burden of proving a lack of secondary meaning onto the defendant."). *Accord Papercutter,* 900 F.2d at 564.

■ The plaintiff in this case registered his service mark on November 15, 1988. Five years later, he claims to have submitted an affidavit pursuant to 15 U.S.C. § 1065 alleging that his use of the mark has been continuous in commerce. The plaintiff has not shown that the PTO considered evidence of secondary meaning when it granted the registration of the plaintiff's Karate Kid service mark. He now claims that his mark is incontestable under the statute, *see* 15 U.S.C. §§ 1065 and 1115(b), and cannot be attacked on the basis of lack of *secondary meaning.* The Court disagrees for three reasons.

First, in this Court's view, the incontestability of a registered mark provided by 15 U.S.C. §§ 1065 and 1115(b) applies only to the first aspect of the presumption accompanying registration of a mark; namely, its prima facie validity of exclusive use in commerce. The incontestability provision of the statute does not apply to the second presumption, namely, proof of secondary meaning, because where the PTO never reviewed evidence of a descriptive mark's acquiring secondary meaning at the time of registration, it would undermine the statute's purpose of allowing competition in non-distinc-

tive marks to subsequently afford a registered mark that has not been shown to have secondary meaning incontestable status.

Second, the statute provides that if a court proceeding is pending at the time of submission of the five year affidavit for incontestable status, the mark cannot obtain incontestable status. *See* 15 U.S.C. § 1065(2). This action was commenced in 1991 and the amended complaint was filed in November 1992, four years after registration. Section 1065(2) therefore, precludes the plaintiff's registered service mark from being incontestable.

Third, 15 U.S.C. § 1115(b)(4) provides that although a registered mark becomes incontestable under 15 U.S.C. § 1065, the conclusiveness as to its exclusive use can be negated by a showing by the alleged infringer that: (1) it adopted its mark without knowledge of the registered mark's prior use, and (2) it, meaning Columbia Pictures, has used its mark continuously from a date prior to the registration of the registered mark. In this case, the defendants obtained their mark in 1984, prior to the registration of the plaintiff's mark in 1988, after conducting a trademark search that did not reveal the plaintiff's use of the words "Karate Kid". Moreover, the defendants have used their mark in commerce continuously since 1984, a date that is obviously prior to the plaintiff's registration of his service mark. Therefore, section 1115(b)(4) also precludes the plaintiff's service mark from being deemed conclusively incontestable. Accordingly, this Court holds that lack of secondary meaning can be used to challenge the plaintiff's service mark, and the burden of proof with respect to any secondary meaning acquired by the plaintiff's service mark remains with the plaintiff.

## A. Designation of the Plaintiff's Service Mark.

■ The first prong of the test for infringement requires the court to determine which category of trademark the plaintiff's mark belongs to, in order to ascertain the level of protection afforded it. *Bristol–Myers,* 973 F.2d at 1039. The four judicially developed categories of trademarks, arrayed in ascending order of their strength and, thus, level of protection, are (i) generic, (ii) descriptive, (iii) suggestive, and (iv) arbitrary and fanciful. *Id.* (citing *Abercrombie & Fitch Co. v. Hunting World,* 537 F.2d 4, 9 (2d Cir.1976)). The term "strength" as applied to trademarks "refers to the distinctiveness of the mark, or more precisely, [the mark's] tendency to identify the goods sold under the mark as emanating from a particular ... source." *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir. 1979). Although these four categories of mark can be useful in the court's considerations, "establishing a particular term or symbol as a valid trademark depends ultimately on its distinctiveness, or its origin-indicating quality in the eyes of the purchasing public." *Pirone v. MacMillan, Inc.,* 894 F.2d 579, 582 (2d Cir.1990) (quoting *McGregor–Doniger,* 599 F.2d at 1131). Thus, for distinctiveness we look to origin.

■ The Court will review the four categories of trademarks. Generic marks are those that "refer to the genus of which the particular product is a species," *Park' N Fly, Inc.,* 469 U.S. at 194, 105 S.Ct. at 661 (1985) (citing *Abercrombie & Fitch,* 537 F.2d at 9), and entail the "common descriptive name of an article or substance," such as "aspirin", "thermos" or "escalator." *Thompson Medical,* 753 F.2d at 212–13.

■ Descriptive marks are those that "describe the qualities, ingredients, effects or other features of the product naturally and in ordinary language." *Thompson Medical,* 753 F.2d at 212; *Abercrombie & Fitch,* 537 F.2d at 11 (a descriptive mark "forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods."). A mark can be descriptive in two ways. It can literally describe the product, or it can describe the purpose or utility of the product. *Bristol–Myers,* 973 F.2d at 1040. Surnames or personal names used as trademarks are generally regarded as descriptive marks. *Pirone,* 894 F.2d at 583; *Abraham Zion Corp. v. LeBow,* 761 F.2d 93, 104 (2d Cir. 1985).

■ A suggestive mark "requires imagination, thought and perception to reach a conclusion as to the nature of the goods" it

represents. *Bristol–Myers*, 973 F.2d at 1040.

▉ Arbitrary marks are those whose terms have a meaning, but not one that is usually associated with the product so designated. Fanciful marks are those whose terms are "coined," having no independent meaning. *Lebow*, 761 F.2d at 104.

▉ Because the intrinsic nature of suggestive, arbitrary and fanciful marks "serves to identify a particular source of a product, [such marks] are deemed inherently distinctive and are entitled to protection." *Two Peso, Inc.*, —— U.S. at ——, 112 S.Ct. at 2757. In contrast, generic marks are never entitled to trademark protection, because they are by nature non-distinctive.

▉ With respect to the descriptive category of marks, those which are merely descriptive of a product "do not inherently identify a particular source, and hence cannot be protected." *Two Peso*, —— U.S. at ——, 112 S.Ct. at 2757. In order for a descriptive mark to be entitled to protection, it must have acquired a public distinctiveness as to its source. This distinctiveness is called "secondary meaning." To establish secondary meaning, the owner of the mark must show that "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982); *Bristol–Myers*, 973 F.2d at 1040 (a term has acquired secondary meaning in its particular market when the "consuming public primarily associates the term with a particular source."); *Lebow*, 761 F.2d at 104 (citing *Abercrombie & Fitch*, 537 F.2d at 10) (a term has acquired secondary meaning when "the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning identifying that business."). It is not necessary that all consumers relate the product to its producer. It suffices for the purposes of establishing secondary meaning that "a substantial segment of the relevant group of consumers make the requisite association between the product and the producer." *Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1222 (2d Cir.1987). Moreover and significantly, to qualify for trademark protection, "an owner of a descriptive mark must demonstrate that the mark had acquired secondary meaning *before* its competitor commenced use of the mark." *Papercutter*, 900 F.2d at 564 (emphasis supplied); *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980).

In discussing the standard and factors that are to guide a court when considering whether a particular descriptive term has acquired secondary meaning, the Second Circuit has explained:

Secondary meaning is an essentially factual determination, proof of which " 'entails vigorous evidentiary requirements.' " *Thompson Medical*, 753 F.2d at 217. We will reverse the district court's determination that a term has not acquired secondary meaning only if that determination is clearly erroneous.

Among the factors that we have found relevant to this inquiry in the past are advertising expenses, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize and length and exclusivity of use. There are undoubtedly other types of evidence that would also be relevant to a claim for secondary meaning. The fundamental question, however, is whether " 'the *primary* significance of the term in the minds of the consuming public is not the product but the producer.' " *Centaur Communications*, 830 F.2d at 1221.

*Bristol–Myers*, 973 F.2d at 1041 (emphasis in original, quote citations omitted).

▉ The burden of proof with respect to secondary meaning is "on the party claiming exclusive rights in the designation." *Bristol–Myers*, 973 F.2d at 1041 (quoting *PaperCutter*, 900 F.2d at 564). As explained earlier, in the case of a registered mark proof of secondary meaning is presumed. *See Papercutter*, 900 F.2d at 563; *Thompson Medical*, 753 F.2d at 216 n. 14. However, this presumption is applicable only if the mark was registered because of its secondary meaning. In the absence of evidence that

the PTO registered the mark because of its secondary meaning, such registration does not shift the burden of proving a lack of secondary meaning onto the defendants. *Papercutter,* 900 F.2d at 564; *20th Century,* 747 F.2d at 89 n. 8. Accordingly, under the facts of this case, the burden of proving secondary meaning is on the plaintiff. The threshold determination of which category a mark belongs is made by the court. *See Thompson Medical,* 753 F.2d at 216; *Pirone,* 894 F.2d at 582. "The focus in categorizing a mark is on how the words are used in context rather than their meaning in the abstract." *Bristol–Myers,* 973 F.2d at 1041.

The plaintiff argues that his mark is "fanciful," and does not require secondary meaning to be afforded protection under the Lanham Act. The Court disagrees. The term "The Karate Kid" is not a "coined" term that has no independent meaning, making it fanciful. Rather, it is the Court's opinion that the plaintiff's service mark belongs to the descriptive category of marks.

 Essentially, the term "The Karate Kid" describes the features or characteristics of the service provided by the plaintiff "naturally and in ordinary language." *Thompson Medical,* 753 F.2d at 212. The service protected under the mark is for organizing and conducting karate training and exhibitions. In the context of the terms' use, "The Karate Kid" describes the plaintiff and the purpose of the service DeClemente provides, and does not require any "imagination, thought and perception to reach a conclusion as to the nature of the goods," that would warrant considering the terms as suggestive, fanciful or otherwise distinctive. *Bristol–Myers,* 973 F.2d at 1040. Indeed, the Court notes that surnames or personal names used as trademarks are generally regarded as descriptive marks. *MacMillan,* 894 F.2d at 583. Although the term "Karate Kid" is a nickname, the Court does not find any reason to deviate from the rule as it applies to personal names, given that the plaintiff's mark describes and does not merely suggest the nature of the plaintiff's services.

 Having decided that the plaintiff's mark "The Karate Kid" is descriptive, and in light of the discussion earlier in this decision with respect to the plaintiff's burden of showing secondary meaning, the Court must next determine whether the plaintiff's mark acquired secondary-meaning between the time the plaintiff first started promoting himself in commerce as the Karate Kid in 1968, and the time of the release of the first Karate Kid film in 1984. After hearing the evidence presented by the parties at trial and viewing the evidence in a light most favorable to the plaintiff, it is this Court's view that the plaintiff has failed to meet his burden of proof on this issue, and that judgment as a matter of law must be granted in favor of the defendants with respect to the service mark infringement claim, because the plaintiff's mark never acquired a secondary meaning, as a matter of law.

First and foremost, the evidence reveals that the plaintiff William DeClemente was not, and has never been, recognized by the relevant consumer public in the martial arts market as "The Karate Kid." Beyond a handful of people practicing and teaching karate in Queens and Brooklyn during the mid–1960s, and in some part of Florida in the late 1970s, there is no evidence that anyone else knew the plaintiff as the Karate Kid. No evidence has been adduced that would allow a reasonable juror to find that in the mind of the public, even the consumer public in karate, when a consumer is presented with the term "The Karate Kid," he or she would know the source to be the plaintiff William DeClemente. *See Bristol–Myers,* 973 F.2d at 1040 (a term has acquired secondary meaning in its particular market when the "consuming public primarily associates the term with a particular source."). In the Court's view, the fundamental requirement for finding secondary meaning, namely, that the *primary* significance of the term "Karate Kid" in the minds of the relevant consumer public is not the product or service but William DeClemente himself, has not been established as a matter of law. All of the evidence in this case indicates that the karate community he was involved in was a very small one, involving some persons in Brooklyn and Queens and not elsewhere.

Second, a review of the various factors a court may consider to determine whether the

**46**

mark has acquired secondary meaning also supports the conclusion that the plaintiff's "the Karate Kid" service mark has not acquired such a meaning. These factors include: advertising expenses on the service mark; consumer studies linking the name to a source; the plaintiff's sales success; unsolicited media coverage of the mark; attempts to plagiarize the mark; and length and exclusivity of the mark's use by the plaintiff. *Thompson Medical*, 753 F.2d at 217. No single factor is determinative, and each case must be resolved by reference to the relevant factual calculus. *Id.*

The plaintiff has offered some evidence as to certain advertising efforts with regard to the service mark, either for the years prior to 1984, or thereafter, but virtually no evidence as to any expenses on his part. *See, e.g., Centaur Communications*, 830 F.2d at 1222. Whatever advertising expenses can be inferred from the fliers or business cards that are in evidence showing an attempt to advertise his karate business by fliers, tours or shows represents a minimal effort at advertising by the plaintiff. Certainly, no advertising campaign of any substance or magnitude has been shown and such advertising was done in small, local geographical locations.

Neither has the plaintiff been able to establish any admissible evidence of consumer studies that link the plaintiff's service mark "The Karate Kid" to the source, William DeClemente. Although the plaintiff did indeed have some success in the sale of his services during the years 1968–1984, the Court views this as limited in scope and unsuccessful financially, both before and after the movie. Moreover, it is difficult to evaluate the plaintiff's sales after 1984, because of the influence the Karate Kid films' success may have had on the plaintiff's business sales. As to the unsolicited media coverage of the plaintiff and his Karate Kid schools or services, this was practically nonexistent during the period 1968–1984, and minimal after 1984.

Finally, while the plaintiff's use of the mark prior to the alleged infringement is a lengthy one, it was hardly exclusive. The undisputed evidence presented at trial by the defendants indicates that D.C. Comics marketed and distributed 500,000 copies of a comic book in the mid–1960s whose main character was called "Karate Kid," and that by the 1970s the comic book itself was entitled the "Karate Kid." In addition, other persons and entities used the name "Karate Kid."

Thus, the plaintiff has not met the burden of showing that his mark "The Karate Kid" has obtained a secondary meaning, either before the defendants' alleged infringement in 1984 by the release of the first Karate Kid movie, or at any time thereafter. Accordingly, the Court finds that a matter of law the mark does not have a secondary meaning. On this basis alone, judgement as a matter of law must be entered in favor of the defendants on the issue of liability for the alleged infringement of the plaintiff's service mark.

Having determined that, despite the registration of the plaintiff's service mark, the mark has not acquired a secondary meaning and therefore is not protectable under the trademark laws, it is not necessary for the Court to continue with an analysis of the second-prong of a claim for infringement; namely whether the defendants' allegedly infringing mark is likely to cause consumer confusion. *See Thompson Medical*, 753 F.2d at 215–216 ("Where a mark is ineligible for protection, there is no need to examine likelihood of confusion. Such an inquiry would, of course, be redundant, since a determination that a mark is ineligible for protection establishes that consumers do not associate that mark with a particular source."). However, for the sake of the completeness of the record the Court will continue to the second prong of the test, and discuss the issue of the likelihood of confusion.

**B. Consumer Confusion.**

 To establish a likelihood of consumer confusion as a result of the infringing product, the plaintiff must show there exists "a likelihood that an appreciable number of ordinarily prudent purchasers [will] be mislead, or indeed simply confused, as to the source of the goods in question." *W.W.W. Pharmaceutical, Co., Inc. v. Gillette Co.*, 984 F.2d 567, 571 (2d Cir.1993) (quoting *Mush-*

*room Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)); *Thompson Medical*, 753 F.2d at 213. The relevant confusion is that which affects the purchasing and selling of the goods or services in question. *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991). "Trademark infringement protects only against mistaken purchasing decisions *and not against confusion generally.*" *Id.* (emphasis supplied) (quoting *Restatement (Third) of Unfair Competition*, § 20 reporter's note at 179).

In the seminal case of *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961) *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), the court articulated eight factors for a court to consider when assessing the likelihood of consumer confusion. These factors are: the strength of the prior owner's mark; the similarity between the two marks; the competitive proximity of the products; the likelihood that the prior user will bridge the gap; actual confusion; the defendant's good faith; the quality of the defendant's product; and the sophistication of the buyers. In addition to these factors, others may be considered, including balancing the conflicting interests of the parties involved, the nature of the senior user's priority and the senior user's delay in asserting his claim. *See Thompson Medical*, 753 F.2d at 214 (citing cases). No single *Polaroid* factor is pre-eminent, and the full panoply must be considered.

Consideration of the *Polaroid* factors is applicable to infringement claims involving competing as well as to non-competing products. *Thompson Medical*, 753 F.2d at 214. In addition, claims of consumer confusion "may be dismissed as a matter of law where 'the court is satisfied that the products or marks are so dissimilar that no question of fact is presented.'" *Pirone*, 894 F.2d at 584 (quoting *Universal Studios, Inc. v. Nintendo Co. Ltd.*, 746 F.2d 112, 116 (2d Cir.1984)).

 Moreover, consideration of the *Polaroid* factors is equally applicable in the context of a trademark infringement action alleging "reverse confusion." *See, e.g.*, *W.W.W. Pharmaceutical*, 984 F.2d at 574.

Reverse confusion exists "when a subsequent user selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user." *Lang*, 949 F.2d at 583; *Banff, Ltd. v. Federated Department Stores, Inc.*, 841 F.2d 486, 490 (2d Cir.1988) ("Reverse confusion is the misimpression that the junior user is the source of the senior user's goods.").

(1) *Strength of the Prior Owner's Mark.*

 The focus under this factor is on "the distinctiveness of the mark, or more precisely its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source." *W.W.W. Pharmaceutical*, 984 F.2d at 572 (quoting *McGregor–Doniger*, 599 F.2d at 1131); *Lang*, 949 F.2d at 581.

In effect, this factor requires the Court to take into account the same considerations it reviews when determining what category the plaintiff's mark belongs in; namely, the inherent distinctiveness of the mark, and its degree of distinctiveness in the marketplace. *W.W.W. Pharmaceutical*, 984 F.2d at 572. Moreover, although the mark may be registered, evidence of secondary meaning is relevant and useful in determining the strength of the mark for purposes of consumer confusion. *Lang*, 949 F.2d at 581 (citing *McGregor–Doniger*, 599 F.2d at 1131). Therefore, even if a registered mark is deemed incontestable, the incontestability cannot preclude an analysis of a mark's secondary meaning for the purposes of consumer confusion.

The Court has already determined that as a matter of law the plaintiff's service mark is descriptive, and has not acquired a secondary meaning in the marketplace. Accordingly, the mark is weak.

(2) *The Similarity of the Marks.*

 This factor looks to "whether the similarity of the marks is likely to provoke confusion among prospective purchasers." *W.W.W. Pharmaceutical*, 984 F.2d at 573 (citing *McGregor–Doniger*, 599 F.2d at 1133). In reviewing this factor, the court should "look at the general impression created by

the marks, taking into account all factors that potential purchasers will likely perceive and remember." *Lang,* 949 F.2d at 581 (citing *McGregor–Doniger,* 599 F.2d at 1133–34).

Based on the evidence presented at trial, no reasonable juror could conclude that the marks are similar. Although the marks "are composed of the same words and sound the same when uttered," *W.W.W. Pharmaceutical,* 984 F.2d at 567, there is a significant and fundamental differences between them. The plaintiff's service mark is for the purpose of organizing and conducting karate training schools and exhibitions. The defendants' mark, on the other hand, covers the fictional story of the Karate Kid films, as well as any commercial proceeds from the films' subject matter. It does not pertain to organizing and conducting karate training schools and exhibitions. Moreover, each mark is presented and packaged differently to the public. The plaintiff's mark is presented in a variety of ways, usually as a business card, flyer or a sign. The defendants' mark is advertised as a motion picture, with Ralph Macchio and the figure of Miyagi juxtaposed.

Because the marks are used for different purposes and are presented to the public differently, even though they say the same thing, they are dissimilar and no issue of fact is created. *See Lang,* 949 F.2d at 582.

### (3) *The Competitive Proximity of the Products.*

■ This factor focuses on "whether the two products compete with each other." *Lang,* 949 F.2d at 582. "To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *Id.* In reviewing this factor, the Court may consider "whether the products differ in content, geographic distribution, market position, and audience appeal." *W.W.W. Pharmaceutical,* 984 F.2d at 573.

Here, the two marks at issue are hardly competitive. As explained above, they do not serve the same purpose and they differ in content. The marks are also marketed differently. The defendants' mark is marketed through movie theaters and retail commer-

cial video chains which either rent or sell videos. The plaintiff's mark is marketed through his own efforts, in the form of instruction, exhibitions, videos and some flyers and business cards. Moreover, the geographic distribution and market position of the two marks are as dissimilar as day and night. The defendants' mark enjoys national, if not international distribution, and is a top of the line product. In comparison, the plaintiff's mark enjoys limited distribution, basically in the limited locations of the states of New York, New Jersey and Florida, and does not have the kind of market position enjoined by the defendants' films.

The competitive proximity of the marks at issue in this case is very slight, if not insignificant. Accordingly, this factor does not present a factual issue with regard to consumer confusion. *See Buitoni Foods Corp. v. Gio. Buton & C.S.P.A.,* 680 F.2d 290, 292 (2d Cir.1982) (no likelihood of consumer confusion found between two marks representing, respectively, table wine and liqueurs, where competitive proximity of marks was slight).

### (4) *Likelihood the Prior User Will Bridge the Gap.*

■ The question with regard to this factor is the likelihood that the senior user, DeClemente, will enter the Columbia's market. *Lang,* 949 F.2d at 582. This factor is designed to protect the senior user's interest in being able to enter a related field at some time in the future. *W.W.W. Pharmaceutical,* 984 F.2d at 574. Moreover, an intention to enter the junior user's market would only affect the likelihood of consumer confusion if prospective purchasers knew about it. *Lang,* 949 F.2d at 583.

The plaintiff has not offered any evidence of its intention to enter into Columbia's product line, namely the movie and home video market, or of other products. Nor is there evidence of such an intention. Accordingly, there is no factual issue presented by this factor as well.

### (5) *Actual Confusion.*

■ This factor looks to see "whether any consumers had actually been confused by

the products bearing the allegedly confusing marks." *Centaur Communications*, 830 F.2d at 1227. As explained above, the relevant confusion is that which affects the purchasing and selling of the goods or services in question. Again, "trademark infringement protects only against mistaken purchasing decisions *and not against confusion generally.*" *Lang*, 949 F.2d at 583 (emphasis supplied).

Because the plaintiff has claimed that the defendants' mark creates a likelihood of reverse confusion, the plaintiff must show that his mark has been mistaken by the relevant consumer group as having originated with the defendants. Evidence of actual reverse confusion that might support DeClemente's claim "would involve purchasers or prospective purchasers of [DeClemente's] products who believed that they were produced by or affiliated with [Columbia's] movies." *Lang*, 949 F.2d at 583. No evidence was offered during the trial by the plaintiff showing that confusion between the marks affected a decision by someone to purchase or not purchase the plaintiff's mark, except there was evidence that after the movie came out (i) the walk-in customers to the plaintiff's school would not come in, (ii) the plaintiff had a fight with Mr. Marini, and (iii) that some other people expressed disbelief that DeClemente was the original Karate Kid. With all of the evidence taken as true and viewed favorably toward the plaintiff, it still fails to demonstrate a factual issue of "reverse confusion" under this *Polaroid* factor.

### (6) *The Junior User's Good Faith.*

 This factor considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang*, 949 F.2d at 583. Factors that support a finding of good faith on the part of a defendant junior user include selection of its mark that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel. *Id.* Evidence of intentional copying raises a presumption of creating consumer confusion. *Centaur Communications*, 830 F.2d at 1228.

 In considering this factor, the court in *W.W.W. Pharmaceutical* made the following observation in the context of a senior user, WWW, that is unknown and a junior user, Gillette, that is famous: "Given Gillette's name recognition and good will, and WWW's obscurity, any confusion would have redounded to the plaintiff's, rather than the defendant's benefit." *W.W.W. Pharmaceutical*, 984 F.2d at 575. The Second Circuit's observation in *W.W.W. Pharmaceutical* is equally applicable in this case. This Court believes that any confusion after the release of the first Karate Kid film redounded to the plaintiff's benefit, rather than to his detriment or the defendant's benefit.

Here, the defendants entitled their mark so that it describes the film's hero. Moreover, the defendants have shown that in 1984 they conducted a trademark search for the name "Karate Kid" and did not find the plaintiff's mark listed. Significantly, they obtained permission from D.C. Comics, the one known user of the name "Karate Kid," to title their film "The Karate Kid." In addition, a showing of bad faith on the part of the defendants would require evidence that Robert Mark Kamen was an employee or agent of the defendants, or that the defendants knew that they were copying DeClemente's story or even knew that DeClemente existed. The plaintiff has made no such evidentiary showing. There is no proof that the defendants in this case knew anything about William DeClemente and/or his use of the name "The Karate Kid" prior to 1990.

Finally, even if the plaintiff's contentions that the defendants have used his public persona as the basis for the film's protagonist are taken as true, the Court notes that proof of an intention to copy alone, without any other jury issue concerning a likelihood of confusion under the *Polaroid* factors being presented, does not establish a trademark infringement. *Centaur Communications*, 830 F.2d at 1228.

### (7) *The Quality of the Defendant's Product.*

 If an infringing product is of inferior quality, the senior user is entitled to protect

the reputation associated with its mark from the possibility of being tarnished by the inferior merchandise of the infringer. *W.W.W. Pharmaceutical*, 984 F.2d at 575. The plaintiff does not contend that the defendant's films are of inferior quality, and no such evidence has been presented. In fact, the plaintiff does not contend that the film put "The Karate Kid" in a bad light, nor that the film put the karate industry in a bad light. The plaintiff also does not contend that there is anything detrimental about the use of The Karate Kid film, except to make a hero of the Karate Kid.

### (8) *The Sophistication of the Buyers.*

■ Where the two marks in question have contrasting images and different marketing styles, the sophistication of the marks' customers is entitled to some weight. *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1007 (2d Cir.1983). Generally, where the marks and products are not identical, the sophistication of the buyers' decreases the likelihood of confusion. *Centaur Communications*, 830 F.2d at 1228.

In considering this factor, the Court looks at the general impression of the ordinary purchaser, buying under normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods. *W.W.W. Pharmaceutical*, 984 F.2d at 575. The plaintiff has not presented evidence with respect to this factor. However, a review of the evidence submitted at the trial shows that the marks at issue here, though identical in wording, are not identical in product. Consumers purchase each product for entirely different purposes: the defendants' films for viewing, and the plaintiff's services for karate instruction and exhibition. Accordingly, this factor also does not support a likelihood of confusion as a result of the defendants' mark being marketed.

### (9) *Other Factors.*

Other factors that may be considered under the *Polaroid* test include balancing the conflicting interests of the parties involved, the nature of the senior user's priority and

the senior user's delay in asserting his claim. *Thompson Medical*, 753 F.2d at 214.

■ With respect to a balancing of the conflicting interests of the parties, it is the Court's view that the balancing favors the defendants, because of their first amendment right in creating and marketing a fictionalized story. As explained more fully below, the plaintiff's weak case of reverse consumer confusion does not outweigh the first amendment considerations that the Court must balance when considering infringement claims under the Lanham Act. *See, e.g., Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir.1989) ("The Lanham Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression.").

■ Finally, in this regard, the Court notes that the plaintiff delayed for six years in asserting his claim for infringement of his mark. Furthermore, the Court is led to question the plaintiff's good faith when registering his service mark in 1988, because although he knew for four years that the defendants were using the words "The Karate Kid" in two films, he did not disclose this use in his service mark registration. Evidence has also been presented that the plaintiff knew D.C. Comics published a comic book entitled "Karate Kid", and yet this was also not disclosed on his service mark registration.

An application and analysis of the *Polaroid* factors to the facts of this case, and an overall balancing of the factors, leads the Court to conclude that, as a matter of law, there is no likelihood of confusion presented by Columbia Picture's use of the term "The Karate Kid" in its films, with respect to the plaintiff's service mark. The plaintiff's delay in bringing his claim, and his lack of recognition of the defendants' mark and D.C. Comics' "Karate Kid" on his service mark registration, also weigh in favor of not finding a likelihood of consumer confusion in this case. In the Court's view, the Second Circuit's approving recitation of the district court's admonition in *W.W.W. Pharmaceutical* applies with equal force to the plaintiff in this case:

plaintiff's view of the reverse confusion is overly expansive. Plaintiff claims that the reverse confusion theory of liability prevents a large, more successful defendant company from extensively promoting a similar mark in such a way that plaintiff's trademark is "swallowed up, digested and destroyed for plaintiff's use." ... *However, where the parties are using similar marks on different products and where the balance of considerations ensures against a likelihood of confusion, the law does not give the plaintiff exclusive rights to usage of a particular trademark.* As Judge Weinfeld has written, granting a plaintiff an injunction under such circumstances "would be tantamount to awarding it exclusive dominion over the use of the word, and the right to impair other parties' entrance into areas of endeavor far removed from its own. The trademark laws were not designed to serve this purpose."

*W.W.W. Pharmaceutical,* 984 F.2d at 576 (emphasis supplied) (quoting 808 F.Supp. 1013, 1025–26 (S.D.N.Y.1992)).

■ For the foregoing reasons, the Court finds that there is no legally sufficient evidentiary basis for a reasonable jury to find that a likelihood of consumer confusion, reverse or otherwise, exists in this case. Accordingly, judgment as a matter of law and in favor of the defendants with respect to the plaintiff's service mark infringement claim is appropriate.

### C. First Amendment Considerations.

■ Even if the plaintiff could show that his service mark has acquired a secondary meaning, and that a likelihood of confusion does exist in this case, this Court is of the view that the first amendment interests in this case outweigh the public interest in avoiding consumer confusion.

In *Rogers v. Grimaldi* the Second Circuit fashioned a balancing test to resolve whether a trademark infringement action under the Lanham Act can proceed despite First Amendment considerations. The court held that,

the Lanham Act should be construed to apply to artistic works only where the public interest in avoiding consumer confu-

sion outweighs the public interest in free expression. In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.

*Id.* 875 F.2d at 999.

The analysis to determine consumer confusion and misleading under the balancing test of *Rogers* is conducted by applying the eight factor test for consumer confusion set forth in *Polaroid. See Twin Peaks Productions v. Publications International,* 996 F.2d 1366, 1379 (2d Cir.1993); *Cliffs Notes v. Bantam Doubleday Dell Publishing Group, Inc.,* 886 F.2d 490, 495 & n. 3 (2d Cir.1989) ("the *Polaroid* factors should be applied with proper weight given to First Amendment considerations."); *Girl Scouts v. Bantam Doubleday Dell Publishing Group, Inc.,* 808 F.Supp. 1112, 1122 (S.D.N.Y.1992), *aff'd,* 996 F.2d 1477 (2d Cir.1993) (applying the *Polaroid* factors in the context of balancing consumer confusion and first amendment considerations).

Here, no one doubts that the film title "The Karate Kid" has considerable artistic relevance to the film's content. In addition, because the Court has determined that there is no likelihood of confusion under the *Polaroid* factors, the plaintiff's infringement claim cannot survive a challenge under the first amendment.

Moreover, even if application of the *Polaroid* factors supported a finding of consumer confusion, in this Court's view the defendants' film titles do not explicitly mislead as to the source or the content of their work within the meaning of *Rogers,* for two reasons. First, the plaintiff in this case is not a famous person. In *Rogers,* the Court found that the artistic expression in a foreign film entitled "Ginger and Fred" outweighed the trademark infringement interests of the world renown, household word and star Ginger Rogers, even though the film would mislead some portion of the public into thinking that the story was about Fred Astaire and

Ginger Rogers, *see Rogers,* 875 F.2d at 1001. If that is so, this plaintiff in this case, obviously a competent karate instructor but unknown outside of his compatriots, can hardly claim that his infringement interests in a relatively weak service mark outweigh the first amendment interests of the defendants' Karate Kid films.

Secondly, the defendants' film title "The Karate Kid" does not fall into any of the hypothetical examples described in *Rogers* that could be construed as explicitly misleading, and therefore actionable under the Lanham Act. The defendants' film title does not explicitly state the author or source allegedly associated with it, as would be the case if the film had been entitled, for example, "Bill DeClemente on Karate." Neither does the title contain an explicit signifying endorsement, such as "The Karate Kid, an authorized biography," or "Bill DeClemente: the Karate Kid." Neither does the title contain an implicit signifying endorsement, such as "Come back to Brooklyn, Karate Kid." Rather, like the title in *Rogers,* the defendants' title

> makes no explicit statement that the work is about the person [DeClemente] in a direct sense; the relevance of the title may be oblique and may become clear only after viewing or reading the work. *As to such titles, the consumer interest in avoiding deception is too slight to warrant application of the Lanham Act.*

*Rogers,* 875 F.2d at 100 (emphasis supplied).

Accordingly, even if the plaintiff's allegations of secondary meaning and consumer confusion are true, the defendants' first amendment interest in naming their films outweighs the plaintiff's and even the public's interest in preventing consumer confusion in this case. As a result, the plaintiff's service mark infringement claim must fail. As to the commercial aspects, namely, the sale of goods, the Court rejects the plaintiff's contentions because (1) plaintiff's service mark does not cover commercial goods, which the defendants' mark does, and (2) the plaintiff does not have a valid service mark in the first place.

## II. THE PLAINTIFF'S RIGHT OF PUBLICITY CLAIM UNDER NEW YORK LAW.

The plaintiff's second cause of action is brought under New York Civil Rights Law for violation of his right of publicity.

■ A federal court deciding a pendent state claim under its supplemental jurisdiction must apply the substantive law of the state, and decide the issue of law according to the rule of law established by the highest court of the state, or, if the highest court of the state has not spoken to the issue, according to how the federal court thinks the courts of the state would rule. *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967); *In re Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831, 850 (2d Cir.1992).

Under New York law, there is no independent common-law right of publicity. Rather, "the 'Right of Publicity' is encompassed under the Civil Rights Law as an aspect of the right of privacy, which ... is exclusively statutory in this state." *Stephano v. News Group Publications,* 64 N.Y.2d 174, 183, 485 N.Y.S.2d 220, 224, 474 N.E.2d 580 (1984); *Pirone,* 894 F.2d at 585.

Section 51 of the New York Civil Rights Law provides a cause of action for any person whose "name, portrait or picture" is used within New York for advertising or trade purposes without their consent. The statute not only encompasses a right to privacy which minimizes the intrusion or publication of damaging material to a person by use of their name or picture, *but also encompasses a right to publicity,* which protects the proprietary nature of the persons public personality. *See Brinkley v. Casablancas,* 80 A.D.2d 428, 438 N.Y.S.2d 1004, 1009–10, 1012 (1st Dept.1981) (citing New York cases) ("[W]e believe that the so-called right of publicity is subsumed in sections 50 and 51 of the Civil Rights Law to the extent that even a public figure has a privacy interest which finds recognition in the statute and for violation of which a remedy of monetary redress is provided.").

The nature of an action under the statute for a right of publicity has been articulately

explained by the Court in *Rosemont Enterprises, Inc. v. Urban Systems, Inc.,* 72 Misc.2d 788, 340 N.Y.S.2d 144 (Sup.Ct.N.Y.County 1973) *modified on other grounds,* 42 A.D.2d 544, 345 N.Y.S.2d 17 (1st Dept.1973), as follows:

The instant action is quite clearly premised upon an appropriation for commercial exploitation of plaintiff's property rights in his name and career rather than upon an injury to feelings. *There is no question but that a celebrity has a legitimate proprietary interest in his public personality. He must be considered as having invested years of practice and competition in a public personality which eventually may reach marketable status. That identity is the fruits of his labor and a type of property.*

*Id.* 340 N.Y.S.2d at 146–47 (emphasis supplied). *Accord Brinkley,* 438 N.Y.S.2d at 1012–13; *Gardella v. Log Cabin Products Co.,* 89 F.2d 891 (2d Cir.1937) (a stage or other fictitious name that has come closely and widely identified with the person who bears it is as actionable under section 51 as a private name, because of the "need for protection against unauthorized advertising."); *People v. Charles Scribner's Sons,* 205 Misc. 818, 130 N.Y.S.2d 514, 518 (Brooklyn County Magistrate Court, 1954) (stage or theatrical name which has become known to the public and identifies its bearer virtually to the exclusion of his true name is protected by the statute).

██ Based on the evidence presented to the Court, and construing the evidence in a light most favorable to the plaintiff, The Court finds that the plaintiff cannot sustain a cause of action for violation of his right of publicity under the statute. DeClemente has not shown, and no reasonable jury can find on the evidence presented, that his public personality as "The Karate Kid" was so notorious to the public that it "had come closely and widely identified with the person who bears it," or that he was identified as the Karate Kid "virtually to the exclusion of his true name."

The plaintiff's public personality as the Karate Kid simply has not reached the magnitude of public notoriety necessary to be actionable under the statute as a matter of law. *See Ali v. Playgirl, Inc.,* 447 F.Supp. 723, 727 (S.D.N.Y.1978) ("This Court may take judicial notice that plaintiff Ali has regularly claimed [the appellation "The Greatest"] for himself and that his efforts to identify himself in the public mind as "the Greatest" have been so successful that he is regularly identified as such in the news media."). According to the evidence, the plaintiff was and is known as the Karate Kid only to a small group of people who learned and taught karate in Queens and Brooklyn during the mid–1960s, and perhaps in Florida in the mid–1970s, and to any business associates he developed a relationship with over the years. As the court in *Charles Scribner's Sons* stated:

The statute protects the *true* name of a person from use for purposes of advertising or trade. *It does not protect a nickname known to a few intimates* any more than it protects . . . an assumed name.

*Id.,* 130 N.Y.S.2d at 519 (emphasis supplied).

Accordingly, the plaintiff not having presented evidence to substantiate his claim for violation of his right to publicity under New York Civil Rights Law § 51, judgement as a matter of law in favor of the defendants is granted, and the plaintiff's second cause of action is dismissed.

### III. *DAMAGES*

██ Finally, the Court notes that even if the plaintiff came forward with evidence to support his claims with respect to trademark infringement and violation of his right of publicity, the Court would still be required to dismiss his two causes of action on the grounds that the plaintiff has not been damaged. The plaintiff has not offered any evidence to support his claims of lost sales or actual damages. There has been virtually no evidence to support any compensatory damage award.

"[I]n this circuit proof of real and precise actual consumer confusion is required to recover damages." *W.W.W. Pharmaceutical,* 984 F.2d at 576 n. 6 (citing *Coach Leatherware Co. v. Ann Taylor, Inc.,* 933 F.2d 162, 171 (2d Cir.1991)). The plaintiff has not

demonstrated any actual compensable reverse consumer confusion, and therefore is not entitled to any monetary recovery on his claim for the service mark infringement. Any jury award of monetary damages in any amount in this case would be purely speculative. *Toltec Fabrics, Inc. v. August Incorporated,* 29 F.3d 778 (2d Cir.1994).

Furthermore, the plaintiff has not shown the requisite bad faith on the part of the defendants that is necessary to obtain disgorgement of profits allegedly derived from the infringement on his service mark by the production and distribution of these motion pictures. The plaintiff must prove that the infringer acted with "willful deception" before the infringer's profits are recoverable by way of an accounting. *Banff, Ltd. v. Colberts, Inc.,* 996 F.2d 33, 35 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 599, 126 L.Ed.2d 564 (1993). Bad faith is a necessary predicate for an award of such profits. "Willful deceptive conduct is a necessary basis, a prerequisite for an award of profits." *Id.* So long as willfulness is established, an accounting of profits may be based upon (1) unjust enrichment, (2) damages, or (3) deterrence of a willful infringer. *George Basch Co. v. Blue Coral, Inc.,* 968 F.2d 1532, 1538 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992). Moreover, "a profits award based upon a theory of unjust enrichment requires a showing of actual consumer confusion, or at least proof of deceptive intent, so as to raise a rebuttable presumption of consumer confusion." *Id.*

Here there was not only no evidence of bad faith or willful deception, there was no evidence adduced that the defendants Columbia Pictures or Weintraub knew anything about the plaintiff or that he even existed, until the year 1990.

In sum, in the Court's view, these films helped but did not hurt the plaintiff, at least not in the legal sense.

Accordingly, the motion by the defendants Columbia Pictures, Industries, Inc., Jerry Weintraub Productions, and Jerry Weintraub to dismiss the complaint in its entirety, is granted. The Clerk is directed to enter judgment in favor of the defendants dismissing the complaint.

**SO ORDERED.**